[No. B138149. Second Dist., Div. Seven. Apr. 23, 2004.]

MICHAEL VINER et al., Plaintiffs and Respondents, v.
CHARLES A. SWEET et al., Defendants and Appellants.

## COUNSEL

Munger, Tolles & Olson, Dennis C. Brown, Mark B. Helm, Allison B. Stein, Steven W. Hawkins; Paul J. Watford; Kester & Isenberg and Charles F. Kester for Defendants and Appellants.

Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, Patricia L. Glaser, Peter C. Sheridan and Mila Livitz for Plaintiffs and Respondents.

## OPINION

**PERLUSS, P. J.**—In our initial decision in this case (*Viner v. Sweet* (Sept. 28, 2001, B138149) [superseded by grant of review Dec. 19, 2001 (S101964)] (*Viner I*)), we held to establish causation in fact the plaintiffs in a transactional legal malpractice action are not required to prove the opposing side in contract negotiations would have given them a better deal than they actually obtained had their attorney not been negligent and affirmed most of the jury's multimillion dollar damage award in favor of plaintiffs Michael Viner and Deborah Raffin Viner. The Supreme Court reversed, holding "just as in litigation malpractice actions, a plaintiff in a transactional malpractice action must show that *but for* the alleged malpractice, it is more likely than not that the plaintiff would have obtained a more favorable result." (*Viner v. Sweet* (2003) 30 Cal.4th 1232, 1244 [135 Cal.Rptr.2d 629, 70 P.3d 1046] (*Viner II*).) The Court remanded the matter "for proceedings consistent with the views expressed here." (*Ibid.*)

Having received supplemental briefing after remand and heard further oral argument from the parties, we now conclude the trial court erred in denying the defendant lawyers' motion for judgment notwithstanding the verdict as to five of the seven claims of malpractice asserted against them. Accordingly, we modify the judgment by reducing the award of damages from $13,291,532 to $515,760 and, as so modified, affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The Viners[1] sued their former attorneys, Charles A. Sweet and his law firm Williams & Connolly (collectively W&C), for negligently negotiating and drafting agreements for the sale of their ownership interest in Dove Audio, Inc. (Dove) to Media Equities International (MEI) and termination of their employment with Dove. Under the terms of the agreements as drafted, MEI purchased a significant portion of the Viners' Dove stock for more than $3 million, and the Viners' were to receive $1.5 million from Dove over five years in monthly installments. Dove's series "E" preferred stock was to be held in escrow for distribution to the Viners if Dove defaulted on the monthly payments to them.[2]

The Viners' professional negligence cause of action identified seven acts of malpractice: (1) W&C told the Viners the nonsolicitation clause in the employment termination agreement applied only to the book and audiobook

---

[1] The Viners pronounce their surname "Vee-ner," to rhyme with "wiener."

[2] The history of the Viners' founding of Dove, their subsequent efforts to sell their interest in the company and the events that ultimately led to this litigation are described in greater detail in *Viner I* and *Viner II, supra*, 30 Cal.4th at pages 1235 to 1237.

segments of Dove's business, but because the clause was ambiguous, Dove successfully asserted in arbitration that the clause also encompassed Dove's television and motion picture projects; (2) W&C negligently agreed to a noncompetition provision, which violated Business and Professions Code section 16600's restrictions on such provisions; (3) the employment termination agreement provided for attorney fees only in enforcing an arbitration award; (4) ambiguous language in the provision relating to producer credit caused Dove not to give Deborah Raffin Viner credit as a producer; (5) by virtue of the general release language in the employment termination agreement, the Viners lost their rights to accrued dividends on Dove's series "A" preferred stock; (6) the employment termination agreement did not contain an indemnity provision providing the same level of protection as the Viners had in their employment agreement; and (7) the series "E" preferred stock afforded inadequate security to the Viners if Dove defaulted on the monthly payments due under the employment termination agreement.

Following a four-week trial, the jury returned a special verdict in favor of the Viners on each of the seven claims of negligence, awarding the Viners a total of $13,291,532 in damages. The trial court denied W&C's motion for judgment notwithstanding the verdict in which W&C argued (among other grounds asserted) the Viners had failed to prove the requisite causal connection between W&C's negligent conduct and the damages allegedly resulting from that negligence.

W&C appealed the judgment, arguing with respect to five of the seven claims for negligence that the Viners failed to present substantial evidence, as they were required to do, that a better result would have been obtained absent W&C's claimed negligence. Alternatively, even if such proof had been presented, W&C argued a new trial would be required because the trial court failed to properly instruct the jury on the necessary proof of causation in a legal malpractice action—that is, that the Viners were required to demonstrate that proper handling of their matter by W&C would have resulted in a more favorable outcome.[3]

We affirmed the judgment as modified, holding that the Viners were not required to prove they would have obtained a more favorable result in the

---

[3] The trial court refused W&C's special instruction No. 2, "Professional Negligence— Causation," which provided, "In order to recover damages from an attorney for negligence in transactional work where the plaintiff is complaining that an actual term of the agreement is not as plaintiff would have wanted it, the plaintiff must establish that, but for the attorney's negligence, plaintiff would in fact have been successful either in obtaining the desired term in the agreement or in having the offensive term omitted from the agreement. Thus, a plaintiff cannot establish 'but for' causation if the plaintiff in any event could not have obtained a more favorable term or could not have obtained deletion of an unfavorable term."

Judicial Council of California Civil Jury Instruction No. 601, "Damages for Negligent Handling of Legal Matter," provides somewhat more succinctly and more accurately, "To

transaction with MEI if W&C had not been negligent. Applying what we described as "ordinary negligence and causation principles," we held the evidence at trial supported the jury's finding that W&C's negligence was a substantial factor in causing the Viners to suffer a loss or diminution of their rights and remedies with respect to each of seven separate claimed items of mal practice and affirmed $8,065,732 of the jury's damage award.[4]

The Supreme Court granted review, limited to the issue "whether the plaintiff in a transactional legal malpractice action must prove a more favorable result would have been obtained but for the alleged negligence." (*Viner II, supra,* 30 Cal.4th at pp. 1238–1239, italics omitted.) The Court answered that question "yes": "The Court of Appeal here held that a plaintiff suing an attorney for transactional malpractice need not show that the harm would not have occurred in the absence of the attorney's negligence. We disagree. We see nothing distinctive about transactional malpractice that would justify a relaxation of, or departure from, the well-established require-ment in negligence cases that the plaintiff establish causation by showing either (1) *but for* the negligence, the harm would not have occurred, or (2) the negligence was a concurrent independent cause of the harm." (*Viner II, supra,* 30 Cal.4th at pp. 1240–1241.) The court explained, "In both litigation and transactional malpractice cases, the crucial causation inquiry is *what would have happened* if the defendant attorney had not been negligent. This is so because the very idea of causation necessarily involves comparing historical events to a hypothetical alternative. [Citations.]" (*Id.* at p. 1242.) The court reversed our judgment and returned the case to us for further proceedings consistent with its opinion. (*Id.* at p. 1244.)

## CONTENTIONS

Applying the standard for proof of causation in fact in a transactional malpractice case confirmed by the Supreme Court in *Viner II,* W&C contends the Viners failed to present substantial evidence of causation as to five of their seven claims for malpractice and, because the Viners had a full and fair opportunity to prove their case at trial, the matter should be remanded to the trial court with directions to enter final judgment for the Viners as to the remaining two claims only. The Viners, on the other hand, contend they satisfied the causation standard articulated in *Viner II* as to all seven of their

---

recover damages from [*name of defendant*], [*name of plaintiff*] must prove that [he/she/it] would have obtained a better result if [*name of defendant*] had acted as a reasonably careful attorney."

[4] We concluded the evidence did not support the jury's award with respect to "nonsolicita-tion clause damages" attributable to a print and audiobook project with Frederick Forsyth and "noncompetition clause damages" attributable to two audiobook projects with Jack Higgins, which had a combined value of $5,205,800.

claims and it was, in essence, harmless error for the trial court to refuse to instruct the jury they were required to prove but for causation.

## DISCUSSION

1. *The Trial Court's Omission of an Appropriate Causation Instruction Was Fundamental Error That in All Probability Affected the Jury's Verdict in Favor of the Viners*

In their supplemental briefs and oral argument after remand, the Viners assert they presented substantial evidence they would have obtained a more favorable result but for W&C's malpractice and W&C was not prejudiced by the trial court's refusal to correctly instruct the jury on their need to prove but for causation. (Code Civ. Proc., § 475;[5] *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580 [34 Cal.Rptr.2d 607, 882 P.2d 298] ["there is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.)"].) Accordingly, they urge us to affirm the entire judgment in their favor on the record now before the court without remand for further proceedings.

To accept the Viners' position, we would have to conclude both that they presented substantial evidence of causation in fact and that the absence of a proper causation instruction was harmless error. We disagree on both counts.

With respect to all damage claims other than those relating to producer credit and series "E" preferred stock as security, as to which W&C has conceded sufficient evidence of but for causation was introduced at trial,[6] the Viners failed to present substantial evidence that, if W&C had not been negligent, it is more likely than not they would have obtained a more favorable result either by walking away from the transaction with MEI or by securing better terms in the stock purchase or employment termination agreement. Indeed, the evidence before the jury is directly to the contrary,

---

[5] Code of Civil Procedure section 475 provides in part, "No judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed. There shall be no presumption that error is prejudicial, or that injury was done if error is shown."

[6] The jury awarded the Viners a total of $515,760 in damages for those two claims.

indicating it was (or would have been) MEI's negotiating stance, not W&C's negligence in failing to ask, that led to the unfavorable contract terms.

MEI's principal, Ronald Lightstone, testified concerning the nonsolicitation clause that he did not want the Viners to interfere with Dove's future business by contacting its authors and that the broadest possible nonsolicitation clause was therefore an essential element of the transaction from MEI's standpoint. Lightstone further testified that the noncompetition clause was an extremely important term he would not have given up, a position the Viners' own expert agreed was consistent with MEI's position throughout the negotiations. Lightstone testified he would not have agreed to unlimited indemnity for the Viners, the basis for their damage claim, and that a broader attorney fees provision was inconsistent with his usual approach to negotiating deals. Finally, Lightstone said MEI was simply unwilling to increase the basic economic value of the transaction to the Viners (which included both payment for their stock and monthly payments under the employment termination agreement); therefore, MEI would not have permitted the Viners to retain their rights to series "A" stock dividends.

■ When evaluating this essentially unrefuted evidence to assess the likelihood that the trial court's instructional error prejudicially affected the verdict, we view the evidence in favor of W&C, not the Viners. (*Galvez v. Frields* (2001) 88 Cal.App.4th 1410, 1413 [107 Cal.Rptr.2d 50]; *Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1152, fn. 2 [84 Cal.Rptr.2d 257].) "[W]e must assume the jury might have believed [W&C's] evidence and, if properly instructed, might have decided in [W& C's] favor. [Citations.]" (*Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 773 [15 Cal.Rptr.2d 815].) When the evidence at trial is viewed in this light, together with the trial court's other instructions on causation and damages,[7]

---

[7] The trial court instructed the jury, consistent with BAJI No. 6.00, "The essential elements of a claim for professional negligence, each of which plaintiffs must prove by a preponderance of evidence, are: [¶] (1) The defendants were negligent; and [¶] (2) The negligence of the defendants caused plaintiffs to suffer damage, loss or harm." The court then instructed according to BAJI No. 3.76, "The law defines cause in its own particular way. A cause of damage, loss or harm is something that is a substantial factor in bringing about [] damage, loss or harm." Modifying BAJI No. 14.00, as requested by the Viners, the court explained, "If, under the court's instructions, you find that plaintiffs are entitled to a verdict against defendants, you must then award plaintiffs damages in an amount that will reasonably compensate for each element of claimed damage subject to being reduced, as you have been instructed, if you should find the plaintiffs were contributorily negligent, provided that you find that such harm or loss was suffered by plaintiffs and was caused by the act or omission upon which you base your finding of liability." Finally, the trial court also explained at the request of the Viners, "An innocent party damaged by the acts of another will not be denied recovery simply because precise proof of the amount of damage is not available. The law only requires that some reasonable basis of computation be used, and will allow damages so computed even if the result reached is only an approximation."

and counsels' arguments,[8] it is at the least "reasonably probable" that the jury's verdict was affected by the omission of a "more favorable result" instruction and that it would not have awarded the Viners $13,291,532 in damages if it had been properly instructed. (*Soule v. General Motors Corp., supra,* 8 Cal.4th at pp. 580–581 & fn. 11 ["Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]"]; accord, *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983 [67 Cal.Rptr.2d 16, 941 P.2d 1203]; *Logacz v. Limansky, supra,* 71 Cal.App.4th at p. 1156.)

> 2. *The Trial Court Erred in Denying W&C's Motion for Judgment Notwithstanding the Verdict as to Five of the Viners' Seven Claims of Malpractice; Judgment Should Be Entered as if Those Portion of the Motion Had Been Granted*

W&C asserts the trial court erred in denying its motion for judgment notwithstanding the verdict, arguing with respect to all damage claims other than those relating to producer credit and series "E" preferred stock security, the Viners failed to present sufficient evidence of causation in fact to support the jury's verdict, even viewing the evidence in the light most favorable to the Viners. (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110 [120 Cal.Rptr. 681, 534 P.2d 377] [" 'A motion for judgment notwithstanding the verdict of a jury may properly be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence to support the verdict. If there is any substantial evidence, or reasonable inferences to be drawn therefrom, in support of the verdict, the motion should be denied.' [Citation.]"; see *Henrioulle v. Marin Ventures, Inc.* (1978) 20 Cal.3d 512, 515 [143 Cal.Rptr. 247, 573 P.2d 465] [appellate court in reviewing trial court's grant or denial of a motion for judgment notwithstanding the verdict uses same standard of review as employed by the trial court in deciding the motion].) We agree: As to W&C's malpractice regarding the scope of the nonsolicitation, noncompetition and indemnity clauses and the absence of provisions for attorney fees and for retention of their rights to series "A" stock dividends, the Viners presented no evidence at all, substantial or otherwise, indicating that, but for W&C's negligence, it was more likely than not they would have obtained a more favorable result in their negotiations with MEI.

---

[8] In assessing the likelihood that instructional error prejudicially affected the verdict, "[t]the reviewing court should consider not only the nature of the error . . . but [also] the likelihood of actual prejudice as reflected in the individual trial record, taking into account '(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.' [Citation.]" (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983 [67 Cal.Rptr.2d 16, 941 P.2d 1203]; *Soule v. General Motors Corp., supra,* 8 Cal.4th at pp. 580–581.)

■ It follows that the trial court erred in denying W&C's motion for judgment notwithstanding the verdict. To avoid subjecting the parties to further delay and expense, we will modify the judgment as if W&C's motion had been granted as to the five damage claims lacking evidentiary support and affirm the judgment as so modified. (Code Civ. Proc., § 629 ["If the motion for a judgment notwithstanding the verdict be denied and if a new trial be denied, the appellate court shall, when it appears that the motion for judgment notwithstanding the verdict should have been granted, order judgment to be so entered on appeal from the judgment . . . ."]; *Sagadin v. Ripper* (1985) 175 Cal.App.3d 1141, 1170 [221 Cal.Rptr. 675]; *Bank of America v. Superior Court* (1990) 220 Cal.App.3d 613, 624 [269 Cal.Rptr. 596] ["The effect of section 629 is that a reversal on appeal for insufficiency of the evidence concludes the litigation just as it would have been concluded if the trial court had correctly entered judgment notwithstanding the verdict."].)

a. *There Is No Substantial Evidence of a More Favorable Result Under a "No Deal" Scenario*

It is true, as the Viners insist, there is substantial evidence in the record that they would have walked away from the transaction if they had not been assured of their ability to work with their business contacts in film and television production projects after leaving Dove—that is, if they had known the nonsolicitation clause (§ 1.10) in the employment termination agreement had not been negotiated and drafted in accordance with their directions to W&C. But the Viners failed to present any evidence to prove they would have been better off economically under this "no deal" scenario (that is, if they had remained the principal owners and key employees of Dove) than they were in fact under the terms of the deal as actually completed.[9]

Certain types of damages claimed by the Viners are simply nonexistent under the "no deal" scenario. Without the employment termination agreement, the Viners' indemnification rights would have remained unchanged; neither series "A" stock dividends nor producer credits would be an issue; no security for payments under the agreements with MEI would have been given; and there would be no attorney fees, and therefore no need for reimbursement of those fees, in connection with arbitration to enforce the agreements between the Viners and MEI.

As to the two largest damage categories—the author-reader nonsolicitation issue and the audiobook noncompetition issue—the Viners' evidence of

---

[9] As our dissenting colleague acknowledges, the various ways in which the Viners may have been better off financially if they had walked away from the transaction were not advanced at trial by the Viners, who "elected not to submit a no deal theory to the jury." (Dis. opn. *post*, at p. 1246.)

injury and damages was premised on the assumption they would have pursued various projects on their own, not that they would have been undertaken by Dove. Yet if the Viners had not terminated their employment, the various projects described by their expert witness in her damage analysis would have been corporate opportunities properly exploited by Dove itself, not the Viners personally. (See *Thompson v. Price* (1967) 251 Cal.App.2d 182, 190 [59 Cal.Rptr. 174] [" ' "a corporate officer or director may not seize for himself to the detriment of his company business opportunities in the company's line of activities which the company has an interest and prior claim to obtain" ' "]; *Pigeon Point Ranch, Inc. v. Perot* (1963) 59 Cal.2d 227, 233 [28 Cal.Rptr. 865, 379 P.2d 321] ["[T]he law does not allow [a director or officer] to secure any personal advantage as against the corporation."], overruled on other grounds by *Kowis v. Howard* (1992) 3 Cal.4th 888, 899–900 [12 Cal.Rptr.2d 728, 838 P.2d 250]; *Heckmann v. Ahmanson* (1985) 168 Cal.App.3d 119, 126–127 [214 Cal.Rptr. 177].) The record is devoid of evidence quantifying any benefit to the Viners through increased compensation or enhanced corporate stock value those projects would have generated if the transaction with MEI had been aborted, nor is there any basis for the jury to compare those projected benefits to the value actually received by the Viners from the deal as structured (which included $3 million for the sale of their stock, as well as more than $1 million in payments under the employment termination agreement).[10]

b. *Mere Disbelief of W&C's Witnesses Does Not Constitute Substantial Evidence the Viners Could Have Obtained a More Favorable Result*

The Supreme Court in *Viner II* confirmed that causation in a transactional malpractice need not be proved with absolute certainty and that, "[i]n transactional malpractice cases, as in other cases, the plaintiff may use circumstantial evidence to satisfy his or her burden. An express concession by the other parties to the negotiation that they would have accepted other or additional terms is not necessary." (*Viner II, supra,* 30 Cal.4th at pp. 1242–1243.)

As previously noted, W&C concedes substantial evidence supports the Viners' claim more favorable contract provisions relating to producer credit and series "E" security could have been obtained but for W&C's negligence. However, neither direct nor circumstantial evidence exists in this record that reasonably supports an inference the Viners could have obtained better deal

---

[10] In order to prove that walking away from the MEI deal rather than accepting the transaction as actually (and negligently) negotiated by W&C would have yielded a more favorable result, the Viners would also have had to respond to the evidence Dove's actual financial situation radically deteriorated during the relevant time period.

terms on the five contract provisions at issue. Indeed, in the brief they submitted in *Viner I*, the Viners acknowledged "it is impossible to prove what the other side might have agreed to during negotiations had the malpractice plaintiff's lawyer known enough to raise certain issues." We agreed, observing at the outset of our legal analysis, "Appellants contend respondents were required to, but did not, prove [MEI] would have given them a 'better deal' than it did, but for appellants' negligence. Because it is undisputed respondents did not attempt to prove [MEI] would have done so on the specific contract terms at issue in this action, appellants contend reversal is required. Respondents, on the other hand, contend they were *not*, on the facts of this case, required to prove absent W&C's negligence, they would have been able to obtain a more favorable deal with [MEI]. Based on the facts before us, we agree with respondents and hold respondents adequately established causation at trial." (*Viner I, supra*, at p. 10, fn. omitted; see *Viner II, supra*, 30 Cal.4th at p. 1238.)

While acknowledging Lightstone's testimony that MEI would not have agreed to more favorable terms on any of the five disputed damage items is uncontradicted, our dissenting colleague observes the jury was free not to find Lightstone's denials credible. True as that may be, disbelief of Lightstone's testimony does not constitute affirmative evidence of the contrary proposition.[11] (*California Shoppers, Inc. v. Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 48 [221 Cal.Rptr. 171] ["If a witness testifies, for instance, that *it was not raining* at the time of the collision, and if the jury disbelieves that testimony, such disbelief does not provide evidence that it *was raining* at the time of the collision."]; *Hicks v. Reis* (1943) 21 Cal.2d 654, 660 [134 P.2d 788] [if the finder of fact refuses to give credence to a witness's testimony, the testimony " 'is of no more effect than if it had not been given. It disappears from the case . . . .' "].) As Judge Learned Hand explained more than a half-century ago, "It is true that the carriage, behavior, bearing, manner and appearance of a witness—in short, his 'demeanor'—is part of the evidence. The words used are by no means all that we rely on in making up our minds about the truth of a question that arises in our ordinary affairs, and it is abundantly settled that a jury is as little confined to them as we are. . . . [S]uch evidence may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if

---

[11] Even if the jury did not accept Lightstone's testimony, it may have believed he could not know whether or not MEI might have agreed to more favorable terms because, as Justice Johnson explains, contract negotiations are *necessarily fluid events.* This *common sense* conclusion that future contingencies are unknowable contradicts the principle of bivalence assumed by the symbolic logic truth tables presented in the dissent. (See dis. opn., *post*, at p. 1236, fn. 2.)

he is, there is no alternative but to assume the truth of what he denies. [¶] Nevertheless, although it is therefore true that in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied them, we think it plain that such a verdict would nevertheless have to be directed against him. This is owing to the fact that otherwise in such cases there could not be an effective appeal . . . . He, who has seen and heard the 'demeanor' evidence, may have been right or wrong in thinking that it gave rational support to a verdict; yet, since that evidence has disappeared, it will be impossible for an appellate court to say which he was." (*Dyer v. MacDougall* (2d Cir. 1952) 201 F.2d 265, 268–269.)

■ The dissent's reliance on Code of Civil Procedure section 437c, subdivision (e), to justify a state-of-mind exception to this general principle is fundamentally flawed. Subdivision (e) provides, "If a party is otherwise entitled to a summary judgment pursuant to this section, summary judgment may not be denied on grounds of credibility . . . except that summary judgment may be denied in the discretion of the court, . . . where a material fact is an individual's state of mind, or lack thereof, and that fact is sought to be established solely by the individual's affirmation thereof." This subdivision of the summary judgment law does not stand for the proposition that disbelief of a witness is sufficient to support an inference the witness's true state of mind was different from what he or she said it was, as the dissent would have it. Rather, when the moving party is required to prove a witness's state of mind to prevail on summary judgment and the only evidence presented is testimony from that individual, Code of Civil Procedure section 437c, subdivision (e) simply authorizes the trial court to deny the motion as if no evidence at all had been presented as to that required element. (See Code Civ. Proc., § 437c, subd. (*o*) [defendant entitled to summary judgment either by demonstrating that one or more of the elements of the cause of action cannot be separately established or by establishing an affirmative defense to that cause of action].) Indeed, the trial court has the same discretion to deny summary judgment "where the only proof of a material fact offered in support of the summary judgment is an affidavit or declaration made by an individual who was the sole witness to that fact . . . ." (Code Civ. Proc., § 437c, subd. (e).)

■ Denial of summary judgment under Civil Procedure section 437c, subdivision (e) does not mean, as the dissent suggests, that a triable issue of fact exists, which would thereafter permit the jury to find in favor of either side, but only that there is an absence of credible evidence needed by the moving party to prevail on summary judgment. (See *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477 [110 Cal.Rptr.2d 370, 28 P.3d 116]; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854–855 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Phrased somewhat differently, disbelief of

affirmative evidence of a witness's state of mind permits denial of a moving defendant's summary judgment motion because it is the equivalent of no evidence at all. At trial, however, disbelief of affirmative evidence, which again is the equivalent of no evidence at all, requires entry of a judgment against the party with the burden of proof on that issue—here the Viners.[12]

### c. *The Viners Had a Full and Fair Opportunity To Prove Their Case at Trial*

The dissent further posits the need for a remand on the possibility the trial court's failure to properly instruct the jury on but for causation "may also have influenced the evidence the parties, particularly the Viners, produced at the trial." But there is simply no basis in the record before us to conclude the Viners were somehow led astray by their own insistence it was unnecessary to prove they would have obtained a more favorable result if W&C had not been negligent and, therefore, failed to marshal the best evidence available to them.[13]

First, as discussed in *Viner II*, at the time of the trial of this matter the Supreme Court had unequivocally held that jury instructions on causation in negligence cases should use the "substantial factor" test articulated in the Restatement Second of Torts and had further "recognized that 'the "substantial factor" test *subsumes* the "but for" test.' [Citation.]" (*Viner II, supra*, 30

---

[12] The dissent's attempt to analogize the issue of the sufficiency of the causation evidence presented by the Viners to the very different question confronted by courts evaluating a criminal defendant's effort to vacate a guilty plea because he or she was allegedly misled by counsel is misplaced. In the guilty plea situation, the defendant's assertion he or she would not have pleaded guilty if given appropriate advice "must be corroborated independently by objective evidence." (*In re Alvernaz* (1992) 2 Cal.4th 924, 938 [8 Cal.Rptr.2d 713, 830 P.2d 747]; *In re Resendiz* (2001) 25 Cal.4th 230, 253 [105 Cal.Rptr.2d 431, 19 P.3d 1171].) ▌ The burden is thus on the defendant to produce affirmative evidence the guilty plea would have been rejected if competent legal advice had been given *in addition to* the defendant's own testimony about his or her state of mind. (Indeed, if the defendant's claim he or she would have rejected the plea is disbelieved, no further inquiry is necessary in order to deny the request to vacate the plea.) That is why, to answer Justice Johnson's question, in these circumstances we properly impose a different burden on civil plaintiffs (who have the burden of proof in legal malpractice actions) than we do on criminal prosecutors (who, in this particular setting, have no burden to produce anything at all).

[13] We agree with Justice Johnson that, in attempting to prove a more favorable result would have been obtained in the absence of attorney negligence, the plaintiff in a transactional malpractice case is not limited to proving he or she could have obtained the exact deal he or she wanted and thought had been obtained, but may establish causation and damages by proving a better "net" deal would have been negotiated but for attorney negligence. However, in this case the Viners presented no evidence any better deal was possible—the deal they wanted or a different but nonetheless economically preferable transaction with either MEI or some other entity—and thus failed to prove their case notwithstanding having a full and fair opportunity to do so. Accordingly, W&C's motion for judgment notwithstanding the verdict should have been granted as to the five disputed claims of malpractice asserted against it.

Cal.4th at p. 1239.) Thus, even if no published appellate decision had expressly held that a plaintiff suing a lawyer for transactional malpractice was required to prove a more favorable result would have been obtained absent the lawyer's negligence, the requirement of proof of but for causation in any legal malpractice case was relatively settled at the time of trial (and remained so until our decision in *Viner I*). (See *Cassista v. Community Foods, Inc.* (1993) 5 Cal.4th 1050, 1055 [22 Cal.Rptr.2d 287, 856 P.2d 1143], superseded by statute on unrelated grounds [holding weight may qualify as a disability under the FEHA only if it results from a physiological condition and denying retrial to plaintiff who failed to prove prima facie case even though no prior California decision had articulated this requirement].)

Second, there is no suggestion in the record that the court ruled on the causation issue prior to the close of evidence; and the Viners were plainly on notice of the potential importance of evidence relating to but for causation from the outset of the trial. How causation could be proved was addressed not only in dueling proposed jury instructions but also in a motion for directed verdict filed by W&C prior to the close of evidence. The Viners' inability to prove but for causation was also the focus of much of W&C's evidentiary presentation and closing argument.

Finally, in their supplemental briefs following remand from the Supreme Court, the Viners have not argued they did not present their strongest possible case on causation and damages because of the trial court's decision to refuse W&C's special instruction No. 2 on but for causation and to instruct the jury instead in accordance with the instructions they had proposed. To the contrary, like W&C, they urge that the question "whether the Viners have proven 'but for' causation" "can and should be answered on the record now before this Court, without a retrial of all or any part of this case."

Having had a full opportunity to try their case, the Viners are not now entitled to a remand and new trial because the evidence fails to support the jury's verdict. "[W]hen the plaintiff has had full and fair opportunity to present his or her case, a reversal of a judgment for the plaintiff based on insufficiency of the evidence should place the parties, at most, in the position they were in after all the evidence was in and both sides had rested. A judgment for the defendant would then be entered, and a new trial permitted only for newly discovered evidence." (*McCoy v. Hearst Corp.* (1991) 227 Cal.App.3d 1657, 1661 [278 Cal.Rptr. 596]; accord, *California Maryland Funding, Inc. v. Lowe* (1995) 37 Cal.App.4th 1798, 1810 [44 Cal.Rptr.2d 784]; *Cassista v. Community Foods, Inc., supra*, 5 Cal.4th at p. 1066; see *Bank of America v. Superior Court, supra*, 220 Cal.App.3d at p. 626 ["the entry of judgment notwithstanding the verdict must ordinarily be predicated on the assumption that the party against whom the motion is made has

presented the strongest possible case . . . the unqualified reversal rule [permitting retrial on remand] has no application in a case where a motion for judgment notwithstanding the verdict was made and denied by the trial court, and the appellate court reverses the judgment for insufficiency of the evidence."].)

## DISPOSITION

The judgment is modified by reducing the award of damages from $13,291,532 to $515,760. As so modified, the judgment is affirmed. Appellants Charles A. Sweet and Williams & Connolly are to recover their costs on appeal. (Cal. Rules of Court, rule 27(a)(3).)

Woods, J., concurred.

**JOHNSON, J.**—I respectfully dissent.

In this case the California Supreme Court granted review to consider the pure legal issue whether plaintiffs in transactional legal malpractice cases must prove they would have obtained a more favorable result but for their lawyers' malpractice. The Supreme Court's opinion decided such a finding was required and reversed this court's decision affirming a judgment against the lawyer accused of malpractice and his firm. Our high court then remanded the matter to this court for further proceedings consistent with its opinion. Consistent with these instructions, I conclude it is neither feasible nor just to resolve this cause without offering the opportunity for a retrial to a properly instructed jury under conditions specified in this opinion.

My colleagues deny that opportunity by finding the evidence at the first trial insufficient to prove this "more favorable result" element, which was not at issue under the instructions given at the first trial. The majority then second guesses what evidence and argument the jury would hear at a retrial where that instruction *was* given, and concludes it would be insufficient as well.

I differ on both counts. I first conclude the evidence introduced at the first trial would have been sufficient to sustain a verdict for the Viners had the trial judge given the "more favorable result" instruction and that jury returned such a verdict. However, this conclusion does not support an outright affirmance, because it cannot be determined with any degree of certainty whether the jury in fact would have reached that same verdict had they heard the missing instruction. But it does fully justify a remand for a possible retrial before a new, properly instructed jury. Secondly, I conclude a retrial is justified for an alternate independent and sufficient reason—to afford both

parties, and particularly the Viners, the chance to introduce additional theories, evidence, and arguments bearing on the "more favorable result" element of this legal malpractice action—theories, evidence, and arguments not necessary when the case went to the jury with a "substantial factor" instruction.

## I. SUFFICIENT EVIDENCE EXISTED TO SUPPORT A JURY VERDICT IN FAVOR OF THE VINERS HAD THE TRIAL COURT GIVEN A "MORE FAVORABLE RESULT" INSTRUCTION AS APPELLANTS REQUESTED.

The majority opinion first argues there was insufficient evidence in the record of the first trial to support a jury finding the Viners could have obtained a more favorable result had Sweet not committed malpractice. This position relies entirely on what W&C characterized at trial as Lightstone's "uncontroverted" testimony MEI would not have accepted terms more favorable to the Viners than those that appear in the contract he signed. The majority opinion agrees with W&C in finding the Viners failed to introduce affirmative evidence disputing the Lightstone testimony and thus concludes there was insufficient evidence to support a jury verdict, had the jury been properly instructed.

In assessing how a jury could have or might have decided a case had it received an instruction the trial court failed to deliver, an appellate court necessarily engages in a hypothetical inquiry. The inquiry becomes doubly hypothetical when the missing instruction itself would direct the jury to embark on a speculative journey into the mind of a key witness and what that witness would or would not have decided if the other side had insisted.

In my view, the proper hypothetical inquiry starts with certain assumptions. First, we must assume the jury received the proper "more favorable result" instruction. Second, we must assume, having heard that instruction, the jury made all the credibility judgments and inferences favoring the Viners on that issue and found they could have obtained a more favorable result, thus returning a verdict for the Viners. Then, accepting those assumptions, we ask whether we would affirm that hypothetical verdict—or reverse on the basis of the insufficiency of the evidence.

A. *Substantial Evidence Was Available To Support A Jury Finding The Viners Could Have Obtained A More Favorable Deal From Lightstone But For Sweet's Malpractice Had The Proper Instruction Been Given.*

Among the key assumptions about the evidence and its evaluation an appellate court properly accepts in this case is that the jury *disbelieved* all or much of Lightstone's testimony. In particular, it is appropriate to assume the jurors rejected Lightstone's claim he would have turned down any terms more favorable to the Viners had Sweet tendered such terms or insisted on them as to one or all five of the disputed contract provisions. As it turns out, this assumption is not at all unreasonable. In this case the jury certainly had ample reasons to doubt the credibility of Lightstone's rigid position he would not have given an inch on any of the five disputed contract provisions.[1]

Undoubtedly, this would be an easier case for respondents if the jury's assumed and probable disbelief of Lightstone's testimony denying he would have accepted any terms more favorable to the Viners in the absence of Sweet's malpractice would be sufficient in itself to support a jury's "more favorable result" finding. Whether one believes the life of the law is logic or is experience there would be reason to adopt that position. Certainly both formal logic and common experience suggest a jury's disbelief of a witness's testimony he "would not" do something should constitute evidence supporting an inference he "would" do that something—in this case that Lightstone *would* have accepted terms more favorable to the Viners than those embodied in the contract they signed.

---

[1] These reasons went far beyond the jurors' reactions to Lightstone's demeanor, an appraisal necessarily based on factors not part of the written record which make them unknowable and thus the source of much of Judge Learned Hand's concern about inferring the "truth is the opposite" of the witness's testimony. (Maj. opn., *ante*, at p. 1229, quoting from *Dyer v. MacDougall* (2d Cir. 1952) 201 F.2d 265, 268–269.)

Here the record reflects facts strongly supporting inferences Lightstone was biased against the Viners and biased in favor of Sweet. He had been on the other side of the negotiating table from the Viners and later on the other side of the courtroom (or at least the arbitration room) from them in disputes arising from the contract. So in a very real sense, he was an adverse witness with a personal animus against the Viners, and thus with a motive to provide testimony that would harm them. Conversely, he also had a motive to shade his testimony in ways helpful to Sweet. After all, the very negotiating behavior found to be malpractice as to Sweet's clients, had proved most beneficial to Lightstone's own interests.

In addition, Lightstone had a personal self-serving business motive for testifying he would not accept the disputed terms, even if he would have. A trial is a public forum and produces a public record. Lightstone is an active businessman and undoubtedly was fully aware he would be negotiating similar contracts in the future. Thus, he had a motive to convey an impression he is a tough negotiator and will not give as to these contract terms in order to send a message to others with whom he may have dealings in the future.

Beginning with the rules of logic, where there are only two possible states, such as Lightstone either "would not" or "would" have acceded to terms more favorable to the Viners, to find "untrue" the statement he "would not" do so is to find "true" the statement he "would" do so.[2] In this, the theory of logic squares with common experience. When a juror or any other person says, "I don't believe Joe when he says he wouldn't have done X," more often than not the next words out of the person's mouth are, "I'm sure he would have."

The California legislature likewise recognizes a witness's statement about his own past or present state of mind, such as what he would or would not have decided to do, is in a special category. Thus, the summary judgment law, Code of Civil Procedure section 437c provides "summary judgment may not be denied on grounds of credibility . . . except that summary judgment may be denied in the discretion of the court, . . . where a material fact is an *individual's state of mind*, or lack thereof, and that fact is sought *to be established solely by the individual's affirmation* thereof."[3] Thus, in this

---

[2] Because it cannot be the case Lightstone both would and would not accept a contract term more favorable to the Viners, one statement is considered the "negation" of the other. One text on logic explains the principle in several ways: "When p is true, not-p is false, and when p is false, not-p is true. If p is true, then the negation of p must be false. If it is the case that p, then it-is-not-the case that p must be false. If something is true, then the opposite of that truth must be false." Shand, Arguing Well (Routledge 2000) page 64.) This same author provides an example of a truth table for such a pair of statements:

| P | -P |
|---|----|
| T | F |
| F | T |

Shand, Arguing Well, *supra*, at page 64; see also, Fisher, The Logic of Real Arguments (Cambridge Univ. Press, 2000) page 146.

The truth table for the statements Lightstone would accept terms favorable to the Viners and Lightstone would not accept terms favorable to the Viners is presented below:

| | Would NOT ACCEPT more favorable terms | Would ACCEPT more favorable terms |
|---|---|---|
| Jury finds Lightstone's testimony | UNTRUE | TRUE |
| Jury finds Lightstone's testimony | TRUE | UNTRUE |

Accordingly, if the jury found Lightstone's testimony he would not have accepted terms more favorable to the Viners than appeared in the contract to be untrue, the inescapable inference is that it is finding it true that Lightstone would have accepted those more favorable terms.

[3] Code of Civil Procedure section 437c, subdivision (e), italics added.

special circumstance,[4] a trial judge has the discretion to doubt the witness's testimony as to his state of mind and allow a jury to decide the witness's state of mind is opposite to what he claims, even though no other evidence is available on that question.[5] This leads to the question: once the issue is before a jury, does it make sense to suddenly require additional affirmative evidence about the witness's own state of mind, beyond the jury's evaluation of his personal testimony about that state of mind?[6]

---

[4] A witness's testimony about his own state of mind, that is, what he would or would not have decided to do on a given occasion, presents a special, indeed unique case. It is readily distinguishable from a witness's testimony reciting his observations of external events, as described in an opinion holding a jury's disbelief of what a witness says cannot prove the opposite happened. "If a witness testifies, for instance, that *it was not raining* at the time of the collision, and if the jury disbelieves that testimony, such disbelief does not provide evidence that *it was raining* at the time of the collision." (*California Shoppers, Inc. v. Royal Globe Ins. Co* (1985) 175 Cal.App.3d 1, 48 [221 Cal.Rptr. 171].) Applied to a witness's observations of ordinary external facts, such as whether it was raining at a certain time or whether the traffic light was red or green at a certain critical moment, the *California Shoppers* statement satisfies the rules of logic. When a jury disbelieves a witness's testimony about what he saw at a certain place and in a given moment, they are merely disbelieving he saw what he says he saw. That does not mean, as a matter of logic, that it didn't happen. So it isn't evidence the opposite event occurred. To put it another way, it does not present the sort of "X" versus "Non-X" dichotomy set up by a witness's testimony as to his own internal state of mind. (See discussion in fn. 2, *ante.*)

[5] Under this code section, a trial judge's disbelief of a witness's uncontradicted testimony concerning his state of mind is enough to create a "triable issue" about that claimed state of mind. To qualify as a "triable issue," moreover, the plaintiff's evidence must be sufficient to support a favorable jury finding on that issue. (See, e.g., *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 861–862 [107 Cal.Rptr.2d 841, 24 P.3d 493] [summary judgment for defendants justified on grounds plaintiff did not produce evidence sufficient to create a "triable issue" on question of whether defendant oil companies conspired, because "[plaintiff] did not present evidence that would allow a reasonable jury to find a conspiracy more likely than not. . . ."])

Thus, when 437c, subdivision (e) provides a trial court's disbelief creates a "triable issue" it strongly suggests disbelief of the witness's testimony would be sufficient in itself to support a jury verdict consistent with a finding the witness's state of mind is different from what he claims. This is especially so when, as here, there are only two possible states of mind—as diametrically opposed as the logician's "X" and "non-X." Lightstone either *would* have been willing to accept terms more favorable to the Viners or he *would not* have been willing to do so, no matter what.

[6] The majority opinion argues the judge's disbelief of the sole witness's "affirmation" he has a certain state of mind merely erases that evidence. Because there is no evidence on the issue at the summary judgment stage the case goes forward to the jury. Thus, according to this argument, the judge's disbelief of the witness's state of mind testimony does not create a triable issue the witness has a state of mind opposite to his "affirmation." (Maj. opn., *ante*, at pp. 1230–1231.) But this ignores the fact 437c, subdivision (e) is not limited to situations where the moving party has the burden and hence erasing that party's sole evidence on a vital issue defeats its summary judgment. This provision also applies where the "material fact" is an essential element of the *plaintiff's* case and where in the absence of the judge's disbelief of the witness's state of mind evidence there is no evidence whatsoever supporting that element. Moreover it also would apply even were the trial court convinced the plaintiff will be unable to

I find it unnecessary to answer this question, however. A finding of sufficient evidence to find the Viners would have gained a "more favorable result" need not depend on the jury's assumed (and likely) disbelief of Lightstone's testimony he would not have accepted terms an iota more generous to the Viners than what appeared in the contract he signed. It is enough to accept the majority opinion's view this disbelief means Lightstone's testimony " ' "is of no more effect than if it had not been given. It disappears from the case . . . ." ' " (Maj. opn., *ante*, at p. 1229.)[7] Indeed it is as if Lightstone never appeared at the trial or was deposed, because of illness or some other reason. As a result, there was absolutely no evidence the jury had to believe supporting a finding Lightstone would *not* have agreed to terms more favorable than what the Viners received as a result of their lawyer's malpractice. The only question is what sort and degree of evidence will suffice to support an inference he *would* have so agreed—at least as to some of the Viners' causes of action.

W&C appears to overstate the plaintiff's burden of proof on this "more favorable result" element and thus denigrates the evidence the Viners have or could produce on this issue. As the majority opinion itself recognizes, the Supreme Court held in this very case: "An express concession by the other parties to the negotiation that they would have accepted other or additional terms is not necessary. And the plaintiff need not prove causation with absolute certainty. Rather, the plaintiff need only 'introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result.' [Citation.]"[8] The Court also observed, "In transactional malpractice cases, as in other cases, the plaintiff may use circumstantial evidence to satisfy his or her burden."[9]

California appellate courts—including this Division—frequently encounter an analogous inquiry in the context of legal malpractice (usually termed "ineffective assistance of counsel") in criminal cases. What happens in these criminal cases is illustrative of the type of evidence the jury here could legitimately have considered and found sufficient in determining the Viners or other plaintiffs had proved a "more favorable result" in a civil case.

In a familiar scenario, a criminal defendant seeks to vacate his guilty plea on grounds he would not have agreed to that plea except for his attorney's

---

produce any other evidence to prove that element. In that circumstance, plaintiffs survive summary judgment only because the trial judge's disbelief of the witness's state of mind testimony is enough in itself to provide positive evidentiary support for that otherwise unsupported element of their cause of action.

[7] Quoting from *Hicks v. Reis* (1943) 21 Cal.2d 654, 660 [134 P.2d 788].

[8] *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1242–1243 [135 Cal.Rptr.2d 629, 70 P.3d 1046].

[9] *Viner v. Sweet, supra*, 30 Cal.4th at page 1242.

malpractice, usually in misleading him about the terms of the plea agreement. If the evidence shows the attorney indeed misled the defendant, the inquiry then moves on to consider whether the defendant would have rejected the deal if he had been properly apprised of its terms. The defendant typically testifies he would not have accepted the plea agreement and entered a guilty plea had he known the true consequences. In the cases that reach this court, the trial court usually has disbelieved the defendant's testimony about what he would have done and instead decided the defendant would have accepted the deal even had his attorney properly informed him of its provisions. More often than not, we affirm the trial court's finding and refuse to allow the defendant to get out of his guilty plea.

Of most relevance here is the sort of evidence and argument trial courts typically consider in deciding whether the defendant would actually have rejected the plea agreement had he understood its true terms. Seldom if ever does the plaintiff, e.g., the prosecution, produce testimony or documentary evidence on this question—such as statements the defendant made to fellow prisoners or others suggesting he would have taken the deal even with the terms he didn't know about when he accepted the original deal. Instead, more often than not, the "evidence" and discussion revolve around whether it would have been probable the defendant would have rejected the actual terms of the plea agreement, given those terms and the consequences of rejecting the agreement.[10] After doing so, trial courts frequently find sufficient grounds to conclude defendants would have accepted the terms they now disavow, despite those defendants' earnest denials they would have accepted those deals and pled guilty had their lawyers properly revealed the unfavorable provisions involved.

---

[10] Some of the evidence and factors a trial judge can consider in making this determination about what a properly represented defendant would have done are described by the California Supreme Court in *In re Resendiz* (2001) 25 Cal.4th 230, 253–254 [105 Cal.Rptr.2d 431, 19 P.3d 1171]:

" 'In determining whether a defendant, with effective assistance, would have accepted [or rejected a plea] offer, pertinent factors to be considered include: whether counsel actually and accurately communicated the offer to the defendant; the advice, if any, given by counsel; the disparity between the terms of the proposed plea bargain and the probable consequences of proceeding to trial, as viewed at the time of the offer; and whether the defendant indicated he or she was amenable to negotiating a plea bargain.' (*In re Alvernaz* [(1992) 2 Cal.4th 924, 938 [8 Cal.Rptr.2d 713, 830 P.2d 747].]) [¶] . . . [¶]

"In determining whether or not a defendant who has pled guilty would have insisted on proceeding to trial had he received competent advice, an appellate court also may consider the probable outcome of any trial, to the extent that may be discerned. [Citations.] Petitioner states that he has consistently maintained his innocence and asserts that the police report shows he has a 'triable case,' but nothing in his declaration or the other evidence he offered indicates how he might have been able to avoid conviction or what specific defenses might have been available to him at trial. Nor did petitioner explain at the hearing on the order to show cause how the evidence might have exonerated him."

Transferred to the context of legal malpractice in civil contract negotiations rather than criminal plea negotiations, the sort of circumstantial evidence bearing on the issue and the decision-making process should be the same. Plaintiffs seeking to establish they could have won more favorable terms from the other party to the contract may, but need not, introduce testimony or documentary evidence or expert testimony directly contradicting the other party's claim they would not have agreed to such terms.[11] But in the absence of such evidence, it is enough the fact finders, whether judges or juries, have enough before them to reasonably infer the other party would have accepted that term or terms, given the alternatives should they reject same, or other surrounding circumstances suggesting it would be unreasonable for a party to reject those terms. (The fact the burden of proof—that is, the risk of nonpersuasion—is allocated differently in the legal malpractice and plea withdrawal situations does not affect the relevance, admissibility nor the weight of this sort of circumstantial evidence when the jury or judge considers what a witness (or defendant) would or would not have done if circumstances had been different.)

Furthermore, it is not essential evidence of these circumstances have been introduced by the plaintiffs, only that those circumstances be before the jury in some fashion. Plaintiffs may bear a *burden of persuasion* (really a risk of nonpersuasion) on this issue, but they don't necessarily have a *burden of production* when it comes evidence of circumstances the jury can use to infer a contracting party like Lightstone would have accepted different terms had they been requested or demanded. In reviewing a judgment for sufficiency of the evidence courts are to consider all the evidence, circumstantial and otherwise, no matter how it arrived in the record.[12] So long as the evidence of these circumstances is present in the record it makes no difference which party introduced it. Indeed, as mentioned above, it is often the case prosecutors produce no new evidence bearing directly on the issue whether a criminal defendant would have rejected a plea deal if aware of its true consequences. Yet trial courts nonetheless frequently find and consider circumstances already in the record supporting a finding the defendant would have accepted the deal and generally appellate courts affirm those findings. There is no reason to impose a different *burden of production* on civil plaintiffs than we do on criminal prosecutors.

---

[11] Some examples of such evidence might include: (1) testimony the other party to the contract at some time admitted it would have accepted those terms if offered; (2) a contract the other party signed with another person or entity which included those terms; (3) expert testimony those terms are commonly included in contracts in that industry or that it would be malpractice for an attorney not to insist on those terms.

[12] "Of course, *all of the evidence must be examined*, but it is not weighed. All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact." *Estate of Teel* (1944) 25 Cal.2d 520, 527 [154 P.2d 384], italics added.

A further point. If this dissent were taking the position this court should affirm the full judgment the Viners earned in the first trial, I would have to be arguing the circumstances discussed below were enough to support the full damage awards flowing from each of the unfavorable terms in the contract Sweet's malpractice produced. But, as explained at the outset, this dissent only urges a remand for retrial.

So the real question is not whether Lightstone would have been willing to accept the precise terms the Viners wanted as to each and all five disputed contract provisions, but rather whether he would have been willing to give them *anything* substantially more favorable than they got as to *any* of those provisions. If there are any circumstances suggesting this is the case as to one or more of the disputed contract terms, retrial is clearly warranted. To put it another way, it is not necessary to conclude the Viners would win the same damage award upon a retrial as they did in the initial trial in order to find they deserve a second chance to demonstrate they suffered a substantial financial loss because of respondents' legal malpractice.

Here there were circumstances reasonably supporting an inference Lightstone would have accepted terms more favorable to the Viners as to one or more of the five disputed contract terms, if only their lawyer, Sweet, had not committed malpractice in negotiating and drafting the contract.

Contract negotiations tend to be a matter of give and take. To claim one would not budge, at least as to some of these terms, even if it meant losing the deal does not square with commonsense understandings of negotiating behavior. The record is replete with indications Lightstone wanted this deal badly. He strongly desired to sever what had proved to be a contentious business relationship with the Viners and to remove them from Dove's management. So it was not as if Lightstone had nothing to lose if he refused to modify some contract term or terms Sweet insisted the Viners required.

Is it likely, for instance, Lightstone really would have made it a "deal breaker" there be no fee shifting in any arbitration proceedings had Sweet urged there should be? Only if Lightstone counted on being the losing party in such arbitrations would it make sense for him to reject that suggestion. Indeed it would be a net benefit to his side if he thought there was more than a 50 percent chance MEI would be the prevailing party in such proceedings and a neutral factor if he felt it was a 50-50 proposition.

Also, is it likely Lightstone would have made a "deal breaker" out of including a legally unenforceable term in the termination agreement, if Sweet had known it was unenforceable under California law and insisted on its removal? The noncompete clause in this termination agreement directly

violates California public policy and statutory law. The fact an arbitrator later on evidently ignored that public policy and the statutory law of our state, thereby enforcing the unenforceable, is no reason to find reasonable a party's insistence on including such a term in a contract to be governed by California law. Even if it could be said Lightstone indeed would not sign a contract unless it contained such a provision, this is not negotiating behavior a California appellate court should be encouraging in any way. In a sense, by construing this as a term a contracting party can impose on another with the threat its absence would be a deal breaker, this court is also enforcing the unenforceable, something a court which is bound by California law should not do, even if arbitrators who are not so bound apparently sometimes do.

In any event, it does not appear a reasonable person in Lightstone's position would have rejected an otherwise favorable contract in order to insist on inclusion of a contract term that is illegal and unenforceable in the jurisdiction the law of which governs the contract. The evidence at trial established the term ended up in the contract because Sweet did not know California law prohibited such a clause. It seems highly unlikely Lightstone would have jeopardized the entire deal by insisting this unenforceable term be included in the contract.

Even the key term in dispute, the nonsolicitation clause, the clause responsible for over three-quarters of the damages the jury awarded, appears unlikely to have been a true "deal breaker" had Sweet drafted and insisted on narrower language. The few words in that clause which turned out to deny the Viners the opportunity to pursue movie and television projects with Dove authors or readers appear to be the result of sloppy draftsmanship by Sweet, not the product of hard fought negotiations with Lightstone. In a sense, this provision represented a "windfall" for Lightstone and MEI.

As pointed out earlier, a judge considering whether a defendant would have walked away from a plea bargain were the terms different from what he thought they were can decide it still would have been reasonable for that defendant to have pled guilty, and on that basis reject his claim he would have turned down the prosecution's offer. For the same reason, the jury here could legitimately decide it still would have been reasonable for Lightstone to have signed this termination agreement even if the nonsolicitation clause did not bar the Viners from pursuing movie and television projects with Dove's authors and readers—and only prevented the Viners from signing them up for future books or audio books. And, as a judge is entitled to use that sort of determination as the basis of a finding the defendant would have accepted the plea despite his current claim he would have rejected it, this jury would have been entitled to decide Lightstone would have accepted the Viners' quite reasonable position no matter he now testifies he would not have done so.

Even less likely to be "deal breakers" were the remaining rather minor terms in dispute. It seems unlikely Lightstone would have cancelled the deal to retain the *exact* terms MEI received as to the indemnity provision or either of the stock provisions.

Nothing in this part of the dissent is meant to say it would have been unreasonable for Lightstone to have turned down a contract containing *all* the favorable terms the Viners thought they had as to *all* five disputed terms. Rather, it is to highlight it appears unreasonable to conclude he would have rejected the entire deal just because he would have to accept at least one—and perhaps more than one—provision which was substantially more favorable to the Viners than the terms MEI ended up receiving. The "circumstances" simply do not support such a finding. If the jurors could reasonably have found it would have been unreasonable for MEI to do so as to even one clause of the contract, they would have been entitled to reject Lightstone's claim he would not have accepted anything more favorable to the Viners, at least as to that clause. They would have been entitled to reject his testimony as to that clause or clauses of the contract—in the same way and for the same reason a trial judge can reject a defendant's claim he would not have accepted a guilty plea had he known the terms were worse than he thought they were.

Recall this dissent does not adopt the position the exact jury verdict and the full damage award we affirmed in *Viner I* should be affirmed in this appeal. Rather, the point is the jury, if properly instructed, reasonably could have found Lightstone would have given the Viners a deal at least somewhat more favorable to them as to at least some of the five disputed provisions of the contract. Since the evidence was sufficient for the jury to have reached such a decision, especially given the jury's assumed and indeed reasonable disbelief of Lightstone's testimony erases any evidence suggesting he would not accept such terms, the Viners are entitled to a new trial to determine how much, if any, of their damage claims will survive the scrutiny of a properly instructed jury.

B. *Substantial Evidence Also Was Available In The Record To Support A Jury Finding The Viners Would Have Obtained A More Favorable Result Under A "No Deal" Theory, A Theory Which They Would Have Submitted To This Jury Had A "More Favorable Result" Instruction Been Given And Which They Should Be Provided An Opportunity to Submit Upon Retrial*

The majority opinion concedes substantial evidence supported a finding the Viners only signed the contract because, based on Sweet's misrepresentations,

they believed they had obtained favorable terms on these key issues. In particular, the majority agrees "there is substantial evidence in the record that they would have walked away from the transaction . . . if they had known the nonsolicitation clause . . . in the employment termination agreement had not been negotiable[13] and drafted in accordance with their directions to W&C." (Maj. opn., *ante*, at p. 1227)

The majority opinion, however, disputes this "no deal" scenario would present a viable cause of action because the Viners could not prove they would have been better off had they failed to sign this termination contract. First, as to certain items of damages the jury awarded them—the imperfect indemnification rights, the absence of arbitration fees related to enforcing the contract, the stock dividends and producer credits, and the like—those items depended on the existence of the contract. Without a contract, there would be no terms to complain about. In this, I agree with the majority opinion.

But the majority opinion goes too far, in my view, when it asserts the Viners would not have been better off with "no deal" than they were with the deal they got, when it comes to the major categories of damages the jury awarded—that is, the lost opportunities they were precluded from pursuing because of the non-solicitation and non-competition clauses in the agreement they were misled into signing. The majority opinion disregards these lost opportunities because, without this termination contract, they "would have been corporate opportunities properly exploited by Dove itself, not the Viners personally." (Maj. opn., *ante*, at p. 1228.)

In my view, there are two problems with this analysis. First, it assumes each and every one of the particular projects the Viners sought to undertake would qualify as a " ' " 'business opportunit[y] in the *company's line of activities* which the company has an interest and *prior claim to obtain.*' " ' " (Maj. opn., *ante*, at p. 1228.) Second, it assumes too much—or recognizes too little—about the range of options available to the Viners had they walked away from this particular contract with this particular party—options fore-closed when their own lawyer misled them into signing that contract. Those options were several, and any of them would have freed the Viners to pursue all the missed opportunities as their personal projects not as Dove's corporate opportunities.

To begin with, several of the Viners' proposed projects foreclosed by the expansive language of the nonsolicitation clause of the termination agreement were *not* "corporate opportunities" of Dove in the absence of that

---

[13] For reasons expressed in section I of this dissent, I do not agree the nonsolicitation clause was nonnegotiable had Sweet told the Viners it barred them from pursuing movie and TV deals with Dove's authors and readers. Rather the "no deal" scenario provides another basis for finding they could have obtained a "more favorable result" even if that were true.

clause. Dove's "line of activities" was the production and sale of books and audio-books. Thus, the Viners' various projects to make films or television productions out of books Dove authors had written did not represent "corporate opportunities" they were barred from undertaking independently just because they were officers and directors of Dove. Those projects—and the Viners' lost opportunity to pursue them—accounted for almost $10 million of the $13 million the jury awarded. It is true this court in its original opinion erased almost half of this item of damages because we concluded the Viners were barred from the Forsythe project by another term of the contract which the Viners had not challenged. But in a "no deal" scenario, that same unchallenged term also would not have existed. Consequently, the Forsythe award would be restored and under a "no deal" scenario the Viners would be entitled to the full $9,901,050 the jury awarded for malpractice related to the nonsolicitation clause.

But even assuming arguendo everything the Viners proposed to undertake represented a "corporate opportunity" of Dove they still would have been better off with "no deal" because the deal they got deprived them of several options that would have freed them to pursue all of these opportunities as personal projects.

First, had the Viners not sold their stock and their positions as officers and directors of Dove as part of this termination agreement, they would have retained the option of selling those interests to a third party. They might not have received as high a price from a third party, but they would have been millions ahead of the deal they got from MEI, because they would have remained free to pursue all the profitable opportunities the jury found they lost because of conditions in the agreement Sweet negotiated with Lightstone.

If the Viners could not find a suitable buyer for their interests in Dove, a second option would have been to retain their stock in Dove, but resign their positions as officers and directors. Ordinarily a mere shareholder's business deals, even those directly competitive to the corporation in which he or she holds stock, does not qualify as a "corporate opportunity." Had the Viners been informed of the true terms of the termination agreement, and came to realize Lightstone would never yield on the broad nonsolicitation and non-competition clauses (assuming that were the case), they would have been better off resigning from any positions in Dove that foreclosed them from pursuing these more profitable opportunities on their own.

Yet a third option would have been to surrender their shares as well as their corporate positions. In the unlikely event they received legal advice their status as Dove shareholders prevented them from pursuing these promising projects on their own, they would have retained this further option had they

not signed the termination agreement. This would have represented more of a sacrifice but still would have been a financially sensible option. After surrendering their entire interest in Dove, they stood to gain far more from the projects they proposed to undertake than the $4 million they received from selling the stock to MEI.

Based on Sweet's representations about the content of the contract they were signing, the Viners thought they would receive a tight fitting, but tolerable sweater. Instead they ended up in a straightjacket. Virtually any option would have been preferable to that straightjacket, and would have been available and probably exercised but for Sweet's malpractice.

The majority opinion makes much of the fact the Viners elected not to submit a "no deal" theory to the jury. But my colleagues ignore the reason for this—the absence of a "more favorable result but for" instruction. As late as the argument over W&C's motion for a directed verdict the Viners' counsel was advancing the "no deal" scenario as a reason to deny that motion. But when the trial court decided a "more favorable result" instruction was inappropriate the Viners no longer had a reason to submit the "no deal" theory to the jury and thus did not do so. After the Supreme Court opinion holding such an instruction is required, however, the Viners have recognized the utility of such a theory and urged it in their supplemental briefing in this court.

The majority opinion also argues the Viners failed to introduce evidence supporting a "no deal" scenario. But what was lacking was not evidence but only argument. All the evidence required to sustain such a theory was in the record. There was ample evidence demonstrating what the Viners lost because Sweet's malpractice misled them into signing a bad deal, also what they gained from the deal (and hence would offset their losses), and also their firm position they would not have signed the contract had they known Sweet had not gained the terms he said he had. It is difficult to imagine what more evidence they would have needed in order to submit a "no deal" theory to the jury.

## II. WHILE THE EVIDENCE WAS SUFFICIENT TO SUPPORT A VERDICT FOR THE VINERS HAD A "MORE FAVORABLE RESULT" INSTRUCTION BEEN GIVEN, A RETRIAL NEVERTHELESS IS REQUIRED.

I agree with my colleagues when they hold the trial court's failure to deliver a "more favorable result but for" instruction was not harmless error. Like them, I conclude it is "reasonably probable" the jury's verdict was

affected by the omission of this instruction. (Maj. opn., *ante*, at p. 1225.) Conceivably, requiring the jury to find the Viners would have achieved a "more favorable result" in the absence of Sweet's malpractice would have resulted in a defense verdict. More likely, for reasons discussed above, it would have yielded some reduction in the damages awarded or perhaps a defense verdict on one or more of the counts and reduced damages on other counts. That is, the jury might have found Lightstone would have budged on some of the contract provisions but not others or that he would have accepted terms somewhat more favorable to the Viners but not as favorable as the ones Sweet represented they had.

For these reasons, I would find it necessary to remand for a potential retrial despite the presence of sufficient evidence to support a "more favorable result" finding had the jury known it must make that finding.

### III. EVEN IF THE VINERS HAD FAILED TO PRODUCE SUFFICIENT EVIDENCE TO SATISFY A "MORE FAVORABLE RESULT" INSTRUCTION HAD IT BEEN GIVEN AT THE INITIAL TRIAL, THEY ARE ENTITLED TO A RETRIAL WHERE BOTH PARTIES HAVE THE OPPORTUNITY TO PRESENT THEORIES, EVIDENCE, AND ARGUMENT BEARING ON THAT ISSUE.

The majority opinion points to stray clauses in the Viners' briefing and my initial opinion on behalf of this court, which it contends constitute concessions the Viners did not and cannot produce evidence they could obtain a more favorable result but for Sweet's malpractice. In context, however, these comments are not concessions the Viners would be unable to introduce sufficient evidence if a "more favorable result" instruction were required. Instead those comments were included as part of arguments against requiring such an instruction, emphasizing the speculative nature of the inquiry it imposes. Nothing in the Viners' briefing or in the opinion I authored for this court justifies denying the Viners a retrial or the opportunity to produce new theories, evidence or argument on this issue at any such retrial, now that they know this instruction will be given and they will have to prove this specific element in order to recover.

The Supreme Court corrected the Viners and this court on the "more favorable result" element in a transactional malpractice lawsuit. But the high court also corrected the Viners on another important issue—the nature of the evidence required to prove this element. The Viners' counsel repeatedly emphasized, including in argument before the Supreme Court, it would be

impossible to get Lightstone to admit he would have given them terms more favorable than those in the contract they signed. After years of rancor and litigation between them, he simply was the most hostile of possible witnesses. But the Supreme Court pointed out it was not necessary to elicit such testimony from Lightstone.[14] As the majority opinion concedes, the jury's assumed and justifiable disbelief of Lightstone's testimony could completely erase the evidence he would not have accepted terms more favorable to the Viners. And circumstantial evidence of the type discussed earlier in this opinion could support an affirmative finding he would have done so. Upon retrial, the Viners should have the opportunity to act on the Supreme Court's correction of this misconception as well.

As a second reason for disallowing a retrial, W&C and the majority opinion argue the Viners had their one and only shot at proving a "more favorable result" during the first trial. According to this argument the fact the trial court turned down W&C's request for a "more favorable result but for Sweet's malpractice" instruction is irrelevant. Purportedly having failed to produce sufficient evidence to show a "more favorable result" at the initial trial, this argument goes, they are barred from trying again. (Maj. opn., *ante*, at pp. 1231–1233.)

In their briefing and especially their oral argument to the Supreme Court, W&C made the same argument and urged the Supreme Court to reverse the judgment outright. This invitation the Supreme Court unanimously chose not to accept. Instead the high court reversed solely on the legal issue of whether a "more favorable result" element was required in transactional malpractice cases and remanded to this court for further proceedings consistent with that holding. Thus, despite the fact the Supreme Court had before it all the evidence produced at the original trial and further despite W&C's fervent plea this now was really a "sufficiency of the evidence" case and the Viners had failed to supply that degree of evidence, the Justices instead unanimously restricted their consideration and opinion to the pure legal issue of whether a "more favorable result but for the lawyer's malpractice" was an essential element of a transactional malpractice case.

W&C and the majority opinion also overstate the certainty of the law on the issue whether in the context of a transactional malpractice case a "more favorable result" element was implicit in a "substantial factor" instruction and an essential part of that cause of action. In fact, it was not so apparent at the time of this trial and appeal. Indeed in arguing this issue at the trial level W&C's counsel conceded he had found *no* existing California decisions

---

[14] *Viner v. Sweet, supra,* 30 Cal.4th at pages 1241–1242. This passage is quoted at page 1238, *ante.*

holding a more favorable result but for instruction was required in transactional malpractice cases. And, when the Supreme Court finally confronted the issue the justices found it necessary not only to reverse this court's opinion but to disapprove the only other California appellate case then extant which bore on this issue, *Calif. State Auto. Assn. Inter-Ins. Bureau v. Parichan, Renberg, Crossman & Harvey.*[15]

It also is noteworthy the Supreme Court's opinion in *Viner II* led the BAJI Committee to add an entirely new and rather lengthy instruction to be given in all future trials involving transactional legal malpractice. Neither this instruction nor any one like it appeared in the book of California jury instructions at the time of the initial *Viner v. Sweet* trial or the appeal of the judgment in that case to this court. This brand new instruction expressly requires the plaintiff prove, "[t]he negligent handling of this work was a cause of damage and loss to the plaintiff. The word 'cause' as used in this instruction . . . means that *but for*, or in the absence of this negligence, the *plaintiff would have obtained a more favorable result* from the attorney's handling of the work . . . ."[16]

As it would represent *instructional error* for a trial court not to deliver this instruction in a transactional malpractice case now or in the future, it is difficult to argue it was irrelevant no instruction to this effect was given to the jury in *Viner I.* The majority opinion reads too much into the Supreme Court's statement the "but for" element is "subsumed" in the "substantial factor" test. The majority along with W&C appears to argue the "substantial factor" instruction the trial court delivered in this case was sufficient to

---

[15] *California State Auto. Assn. Inter-Ins. Bureau v. Parichan, Renberg, Crossman & Harvey* (2000) 84 Cal.App.4th 702 [101 Cal.Rptr.2d 72]. The Supreme Court disapproved the portion of that opinion justifying the trial court's rejection of a proffered "but for" instruction, which rejection had been based on the difference between transactional and litigation malpractice. (*Viner v. Sweet, supra,* 30 Cal.4th at p. 1244, fn 5.)

[16] Italics added. The full instruction reads as follows: BAJI 6.37.6 TRANSACTIONAL MALPRACTICE—BUT FOR CAUSATION

The plaintiff _____ [also] seeks to recover damages based upon a claim of professional negligence by an [attorney] [(other professional)].

The essential elements of this claim are:

1. That the [attorney] [(professional)] was negligent in the handling of (advising, negotiating, etc.); and

2. The negligent handling of this work was a cause of damage and loss to the plaintiff.

The word "cause" as used in this instruction [only] means that but for, or in the absence of this negligence, the plaintiff would have obtained a more favorable result from the attorney's handling of the work [,namely, _____].

[However, where two or more forces are actively operating, one consisting of a professional's negligence, and the other independent of and not because of any misconduct on the professional's part, and each of these forces by itself is sufficient to bring about the loss, the professional's negligence is a cause of the loss.] (BAJI No. 6.37.6 (Jan. 2004).)

inform the jury it must find the Viners could and would have obtained the terms they thought they had but for Sweet's malpractice.

Obviously, W&C did not regard the "substantial factor" instruction the trial court gave was adequate to alert the jury to the need to find the Viners would have achieved a "more favorable result." Rather W&C's counsel repeatedly and vigorously argued to the trial judge he should give the specific "more favorable result" instruction they proposed. W&C also argued before this court the failure to give that requested instruction was fatal error. At this late date, they should not be heard to argue—as they appear to do—that the absence of the "more favorable result" instruction was irrelevant because it was "subsumed" in the "substantial factor" instruction the court did give.

Nor, as we have seen, did the Committee on Standard Jury Instructions regard the "substantial factor" instruction as given in this case to suggest the need for the jury to consider and find whether the plaintiff would have obtained a "more favorable result" had the lawyer not committed malpractice. Instead of merely stating in the new "transactional legal malpractice" instruction that the lawyer's malpractice must be a "substantial factor in bringing about" the client's harm, the Committee found it necessary to frame an instruction precisely focused on the jury's need to find "but for, or in the absence of [the lawyer's] negligence, the [client] *would have obtained a more favorable result*." (Italics added.)[17]

The requirement the Viners prove a "more favorable result but for Sweet's negligence" was *not* brought to the jury's attention adequately by the "substantial factor" instruction the trial court gave in the initial trial. Thus, any failure on the part of the Viners to produce evidence of a "more favorable result" or to argue all the theories potentially supporting such a finding cannot be assumed to be the product of a failure to possess or procure such evidence.

### IV.   UPON RETRIAL, THE VINERS LIKEWISE SHOULD BE ALLOWED TO PURSUE A "LOST NEGOTIATION OPPORTUNITY" THEORY.

Had Sweet not misled the Viners about the terms he had obtained for them, they would have had a third option beyond signing the contract or walking away. They could have submitted a counteroffer to Lightstone and continued the negotiations. Merely as one example, they could have offered to reduce somewhat the compensation they were to receive in return for more favorable treatment in other terms of the contract—the noncompete clause (unenforceable under California law, anyway) and/or the nonsolicitation clause, in particular.

---

[17] BAJI No. 6.37.6 (Jan. 2004). The full instruction is quoted in footnote 16, *ante*.

Because of Sweet's malpractice, the Viners lost the opportunity to exchange trade-offs with Lightstone—giving up items of less value to them than they were to him in return for gaining items of more value to them but less value to him. It seems obvious the Viners lost far more because some of these clauses existed than Lightstone gained from their presence in the contract. The terms in some of these clauses deprived the Viners of economic opportunities the jury found were very valuable. But there was no evidence suggesting MEI profited as a result of these provisions—directly or indirectly.

In essence, this is but another route to finding the Viners could and would have achieved a "better deal" if not for Sweet's malpractice. Even assuming Lightstone was honest and meant it when he testified he would not have given the Viners more favorable terms on any one of the five contract items in dispute at that point in the negotiations, this does not mean he would not have done so had they sweetened the deal in other respects. Assuming rational rather than vindictive behavior on Lightstone's part, it is reasonable to anticipate he would have engaged in mutually beneficial negotiating behavior. Consequently, had the Viners known Sweet was misleading them when he said he had gotten them the terms they wanted without any further concessions, they might well have decided to continue the negotiations and presented counter-proposals Lightstone would have found attractive. The jury in the second trial should have the opportunity of considering whether the Viners would have ended up with a "better deal" from their perspective had they been given and taken advantage of that opportunity.

The California Supreme Court rightly has decided it is better to enter the speculative world of "if that, then what" rather than omitting the "but for" element in transactional malpractice actions. Upon reflection, I not only bow to their supremacy but agree the opinion I authored was in error on that issue. But if we are entering the "if that, then what" world, and we certainly are, we can't tiptoe in, and then back out because the water predictably is a little chilly.

Contract negotiations are fluid events. Offers and counteroffers, and counter-counter offers, and counter-counter-counteroffers, etc., typically flow back and forth across the table. It is a sophisticated ballet often ending in mid-pirouette or even mid-leap—when the contract is finally signed. But if one side of the negotiations stops the dance too soon, only because their lawyer promises them they have the very terms they told him they wanted despite the fact they don't, that side should not be foreclosed from suing their lawyer for his malpractice. It is one thing if the lawyer only misjudges when the deal is at the optimum for his clients. It is entirely different when the lawyer misrepresents the terms of the deal—as the evidence indicates happened here—and thus leads his clients to sign a bad contract.

Under this third scenario, whether the plaintiff would or would not have been better off with "no deal" than the deal they got is simply irrelevant. Also irrelevant is whether they could have obtained the exact deal they wanted and thought they had. The real question is whether they could have gained a better deal than they ended up with, had the negotiations continued. In most instances under this third scenario, it will not prove to be quite as good a deal as they thought they had. That is, to gain some favorable contract language important to them, they may well have to give somewhat on other contract terms. But almost certainly it will be a "better net deal" than the one they mistakenly signed.

If juries are capable of deciding Lightstone would or would not have accepted terms more favorable to the Viners, they certainly can be entrusted with the determination whether Lightstone would have accepted those terms if the Viners had offered new terms on other issues, which terms were more favorable to him. Cross-examination often would prove especially revealing—as someone in Lightstone's position was exposed to a succession of questions about what changes in the Viners' position on certain contract terms might have caused him to alter his position on other terms. For instance, had the Viners offered to reduce the price of purchasing their stock by $250,000, would Lightstone have been willing to modify the ambiguous language in 1.10 that arguably prevented them from pursuing movie and television deals with Dove authors and readers? How about if they cut the price by $500,000? How much did Dove's earnings increase because of the existence of that language in 1.10? Furthermore, beyond cross-examination of this nature, other testimony and circumstances also could point in the same direction. If the negotiations had not stopped in mid-stream because Sweet erroneously told the Viners they had already "won," further negotiations would have been possible and would have led to a more favorable contract (perhaps to both sides) than the one they signed.

For all of the above reasons, I would not just reverse the judgment, but remand for a possible retrial before a properly instructed jury. That, and only that, appears to be the just resolution of this appeal.