[No. A046789. First Dist., Div. Two. May 18, 1990.]

BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, Petitioner, v.
THE SUPERIOR COURT OF SONOMA COUNTY, Respondent;
IRENE O'CONNELL KRUSE et al., Real Parties in Interest.

**COUNSEL**

O'Melveny & Meyers, Warren Christopher, Bertrand M. Cooper, Karen R. Growdon, Gregory G. Corbeill and Kristian D. Whitten for Petitioner.

No appearance for Respondent.

Lukens and Drummond, William M. Lukens, Frederick E. Watson, Cappello & Foley, A. Barry Cappello, Thomas G. Foley, Jr., and Francis E. Komoroske for Real Parties in Interest.

**OPINION**

**KLINE, P. J.**—This action arises out of long-standing litigation between the Bank of America National Trust and Savings Association (Bank) and real parties in interest Irene O'Connell Kruse, George M. Jewell and Laura E. Jewell, and George R. Jewell (collectively Jewells), apple growers/brokers and processors in Sonoma County.[1] In *Kruse v. Bank of America* (1988) 202 Cal.App.3d 38, Division One of this court reversed a jury verdict in favor of real parties for insufficiency of the evidence. When the trial court denied the Bank's subsequent request for entry of judgment and granted real parties' motions for leave to amend their complaints to add additional causes of action, the Bank petitioned this court for a writ of mandate, prohibition or other appropriate relief. We issued an order to show cause why a peremptory writ of mandate should not issue and now grant the petition.

The question presented is this: After an unqualified reversal based on insufficiency of the evidence, should judgment be entered for the prevailing party or may the case be retried?

STATEMENT OF THE CASE

Kruse filed the original complaint in this action on November 25, 1980, against the Bank and the Jewells. The matter went to trial in 1985 on

---

[1] For ease of reference, this opinion will refer to the Jewells by their individual names rather than to real party in interest Bankruptcy Estate of George M. Jewell and Laura E. Jewell. "Jewell" refers to George M. Jewell, the father of George R. Jewell.

Kruse's third amended complaint and the Jewells' second amended cross-complaint, Kruse having previously dismissed her claims against the Jewells. After a three-month trial, the jury returned verdicts against the Bank aggregating $20,020,000 in compensatory damages and $26,675,000 in punitive damages. The trial court denied the Bank's motion for judgment notwithstanding the verdict and granted its motion for new trial as to punitive damages only, conditioned on Kruse's and the Jewells' acceptance of a remittitur to $6 million in punitive damages; the remittitur was accepted.

On appeal, Division One of this court reversed the judgments for insufficiency of the evidence. Real parties sought a rehearing, which was denied on June 17, 1988; the Supreme Court denied petitions for review and to take further evidence on September 1, 1988. This court issued its remittitur on September 7, 1988.

On September 14, 1988, the Bank filed a motion in the superior court for entry of judgment in its favor or summary judgment or summary adjudication of issues. Real parties obtained a stay while they petitioned the United States Supreme Court for writs of certiorari, which were denied on January 23, 1989. (*Kruse* v. *Bank of America* (1989) 488 U.S. 1043 [102 L.Ed.2d 993, 109 S.Ct. 869, 109 S.Ct. 870].) The Jewells filed a motion on March 6, 1989, for leave to file a third amended cross-complaint adding allegations to previously asserted causes of action and asserting additional causes of action for negligence, intentional interference with prospective business relations, breach of oral contract, rescission, negligent misrepresentation, and violation of the Cartwright Act (Bus. & Prof. Code, § 16700 et seq.). The Bank renewed its motion for entry of judgment on April 10, 1989; pursuant to court order, its alternative motion for summary judgment or summary adjudication of issues remained off-calender. On May 19, 1989, Kruse filed a motion for leave to amend her third amended complaint to add a cause of action under the Bank Holding Company Act Amendments of 1970. (12 U.S.C. § 1971 et seq.)

After a hearing on June 19, 1989, the trial court denied the Bank's motion for entry of judgment, granted Kruse's motion for leave to amend, and granted the Jewells' motion for leave to amend except as to the proposed causes of action for recission and intentional interference with prospective economic advantage. Kruse filed an amendment to her third amended complaint on June 23, 1989, to which the Bank demurred on July 25, 1989. The Jewells filed a third amended cross-complaint on August 10, 1989.

The Bank filed the present petition for writ of mandate on August 4, 1989. On December 14, 1989, this court issued an order to show cause why a peremptory writ of mandate should not issue.[2]

## STATEMENT OF FACTS

As explained in *Kruse* v. *Bank of America, supra*, 202 Cal.App.3d 38 (hereinafter *Kruse*), the underlying litigation concerned a series of related loan transactions challenged under evolving theories of lender liability. The facts are set out in detail in that opinion, from which the following summary is taken to provide the background of the present controversy.

George M. Jewell and his son, George R. Jewell, operated an apple brokerage business in the Sebastopol area as a joint venture, selling apples grown on their ranch and purchased from independent growers to processing plants producing products such as apple juice, dehydrated apples, applesauce, and vinegar. The two major apple processors in the area were the family-owned James O'Connell Company (Company) and the Sebastopol Cooperative Cannery (Co-op). The O'Connells and the Jewells were both long-standing customers of the local Bank.

When James O'Connell died in 1971, his widow, Mrs. Irene O'Connell Kruse, became the sole owner of the corporation, and her 19-year-old son, Dan O'Connell, became manager of the business. Although the Bank had consistently funded the O'Connells' operations, in 1974 it denied Dan O'Connell's request for a capital improvement loan for the processing plant and in 1975 refused to provide the annual line of credit. The Company was soon unable to pay its creditors.

In 1975, the Jewells learned of the O'Connells' financial difficulties and arranged with the local Bank manager, William Sullivan, to borrow money for loan to the Company. In 1976, Jewell borrowed from the Bank and loaned to the Company $150,000 to cover outstanding debts and $114,000 for an equipment purchase; in 1977, Jewell borrowed and loaned to the Company $150,000 to repay a loan the Company owed the Bank.

---

[2] The matter is now before this division rather than Division One for the following reason. In her petition for review by the California Supreme Court, Kruse also requested the court to take additional evidence on allegations of conflict of interest and bias levelled against two of the justices on the Division One panel. After denial of the petition for review and her request to take additional evidence, Kruse filed a lawsuit in federal district court contending that the Division One opinion was rendered in violation of her constitutional rights. (*Kruse* v. *Bank of America* (U.S.D.C., N.D. Cal.) No. C-89-1440 MHP.) Her complaint was dismissed on August 21, 1989. Due to the pendency of the federal action, the Division One justices recused themselves from the present proceeding, which was transferred to this division by order of the Supreme Court.

During 1977 and 1978, Jewell discussed with Sullivan a long-term loan to enable the Company to construct a new dehydrating facility. After an initial discussion which the Jewells claimed led them to believe the Bank would provide the financing, Sullivan told Jewell the Bank would not extend the requested $1.2 million loan if Dan O'Connell remained manager of the new plant. Unwilling to force O'Connell out of his business, Jewell obtained a $650,000 loan from the North Coast Production Credit Association (PCA), evidenced by a seven-year promissory note, and paid the monthly installments on behalf of the Company. Construction of the plant began in May 1978.

After the Jewells obtained the PCA loan, Sullivan made a statement to Jewell which the latter interpreted to mean the Bank was interested in providing a long-term loan. Jewell knew Sullivan did not have authority to approve large loans but had to obtain such approval from the regional credit office. During early 1978, Jewell frequently discussed with Sullivan the long-term financing needed for the O'Connell plant; Dan O'Connell furnished Sullivan with progress reports on the construction; and Sullivan made suggestions for design changes to avoid the plant being classified in a manner he knew would make the regional office reluctant to provide financing. In the spring of 1978, when Jewell applied for a $400,000 equipment loan to purchase the dehydrator for the plant, Sullivan's superiors requested information about Jewell's equity interest in the Company and Sullivan suggested Jewell acquire controlling ownership. After several months, the Bank not having approved the loan, Jewell and his son borrowed a total of $500,000 from PCA; the Bank eventually approved a modified equipment loan of $209,000.

In November 1978, Sullivan and his superior, Jensen, visited the Company's construction site without expressing any reservation about possible financing. In December, Sullivan strongly urged Jewell to acquire a controlling interest in the Company, leading Jewell to believe long-term financing would not be provided unless he did so. Upon Jewell's explanation of the Bank's insistence, Kruse reluctantly agreed to transfer a majority of her stock to Jewell for $180, with the expectation the stock would be returned once the Bank provided the long-term loan. Jewell continued to borrow sums from the Bank for loan to the Company and by March 1979 had a total indebtedness of $1.095 million. Sullivan told him something would be worked out by the end of the year and the Jewells anticipated approval of long-term financing which would allow consolidation of their several debts under a long-term repayment schedule.

In April 1979, Sullivan and Jensen again visited the construction site; Jensen made statements which Jewell assumed meant the Bank would ap-

prove the loan. Sullivan, too, was optimistic about eventual loan approval. In May, when the project was nearing completion, Sullivan requested an appraisal of the plant, the first step toward preparation of the necessary credit report. The appraisal proved too low to justify the loan Jewell needed. Sullivan urged reconsideration by his superiors, but by August he realized the regional credit office would not approve the loan and so informed Jewell. Sullivan retired on disability in September 1979.

In January 1980, Sullivan's successor, Bunch, approved Jewell's $900,000 annual credit line and consolidated his short-term bank debts into a loan payable over four years. Jewell refused Bunch's request to execute deeds of trust on the Jewell ranch as security but signed an agreement not to encumber the ranch. During 1980, prices of processed apple products fell dramatically due largely to a glut on the market from the 1979 apple crop. The Company sustained heavy losses and was unable to repay loans advanced by the Jewells or to pay the Jewells for thousands of tons of apples supplied to the Company for processing. By this time, the company was indebted to the Jewells for $2.7 million and the Jewells were heavily indebted to their growers, PCA and the Bank. Concluding that Jewell would not be able to get out of debt, Bunch informed him the Bank would not loan any more funds.

At this point, Jewell agreed to place two "satellite" parcels of the Jewell Ranch on the market. Because of the agreement not to encumber the ranch, he was unable to obtain financing from other lenders. By November 1980, the Company plant and dehydrator were placed on the market. At a meeting in November 1980 with PCA and Bank officials in San Francisco, attorneys for PCA and the Bank insisted the Jewells liquidate their property or risk foreclosure proceedings. Jewell broke down emotionally and Bunch assured him the Bank would take care of him. When he returned to Sebastopol, Bunch told Jewell that if he gave the Bank deeds of trust on the Jewell properties and the proceeds from the sales of properties, the Bank would pay the growers and protect Jewell from PCA's demands. The Jewells executed and delivered to the Bank deeds of trust to their real property and security agreements on their equipment. The Bank then insisted the Jewells liquidate the Company properties to pay off outstanding bank loans; PCA threatened to file a petition for involuntary bankruptcy to invalidate the Jewells' transfer of their properties to the Bank.

Kruse filed her fraud action against the Jewells and Bank in November 1980. Two months later the Bank received $381,000 from the sale of the Jewell satellite parcels and released some of the funds to pay the senior Jewells' attorney fees in contemplation of voluntary bankruptcy proceedings. The senior Jewells filed a voluntary reorganization petition in bank-

ruptcy on January 28, 1981, and George R. Jewell filed a chapter 11 petition the following May. The Company filed bankruptcy in January 1982.

## DISCUSSION

In *Kruse*, Division One of this court meticulously reviewed the evidence presented at the first trial and determined that proof of essential elements of each of the causes of action was lacking. The opinion concludes: "The judgments, and each of them, are reversed. The cross-appeals are dismissed as moot. Costs are awarded to the Bank." (202 Cal.App.3d at p. 68.) The trial court refused the Bank's subsequent request for entry of judgment in its favor on the basis of the rule that an unqualified reversal of a judgment, without directions to the trial court, "remands the case for a new trial and places the parties in the same position as if the case had never been tried." (*Erlin* v. *National Union Fire Ins. Co.* (1936) 7 Cal.2d 547, 549 [61 P.2d 756]; *Hall* v. *Superior Court* (1955) 45 Cal.2d 377, 381 [289 P.2d 431]; *Atchison etc. Ry. Co.* v. *Superior Court* (1939) 12 Cal.2d 549, 554 [86 P.2d 85]; *Weightman* v. *Hadley* (1956) 138 Cal.App.2d 831, 835 [292 P.2d 909]; *Rossi* v. *Caire* (1919) 39 Cal.App. 776, 777 [180 P. 58]; *Minnick* v. *California Dept. of Corrections* (1981) 452 U.S. 105, 126, fn. 37 [68 L.Ed.2d 706, 721, 101 S.Ct. 2211]; *Gospel Army* v. *Los Angeles* (1947) 331 U.S. 543, 547-548 [91 L.Ed. 1662, 1665-1666, 67 S.Ct. 1428].)

The Bank urges that the trial court's decision to permit retrial was erroneous for three related reasons: Division One's disposition of the *Kruse* appeal was equivalent to a determination that the trial court should have granted the Bank's motion for judgment notwithstanding the verdict; an implied directive to enter judgment for the Bank can be inferred from the Division One opinion; and Division One's disposition of real parties' claims leaves no issues for retrial. We reject all of these arguments. Nonetheless, for a reason not advanced by the Bank, we conclude that the trial court should have entered judgment for the Bank.

### I.

■ The Bank relies on a line of cases which hold that despite an unqualified reversal, a case may be retried only if that was the appellate court's intent. As stated in *Stromer* v. *Browning* (1968) 268 Cal.App.2d 513, 518-519 [74 Cal.Rptr. 155]: "The fact that the rule we discuss is a 'general' rule implies that it has limitations. One limitation is that a case is to be set at large for retrial only when that is the intent of the appellate court. 'Judgment reversed' at the end of an opinion is, of course, strong indication of such intent. But when the opinion as a whole establishes a contrary intention, the rule is inoperative."

In *Stromer,* the trial court found a real estate broker entitled to his commission on a deal that fell through as a result of the seller's actions. The Supreme Court reversed because the evidence did not show lack of good faith on the part of the seller, stating " '[u]nder the circumstances, plaintiff is not entitled to recover his commission.' . . . 'The judgment is reversed.' " (268 Cal.App.2d at p. 517.) On appeal from the trial court's subsequent entry of judgment, the court concluded that the Supreme Court had *not* intended a retrial: "After a case fully tried, with facts not in dispute, the intent of the Supreme Court to us appears patent. It intended, as we read its opinion, that judgment in [the seller's] favor be entered. We can find nothing left for the trial court to retry." (*Id.,* at p. 518.)

The present case differs from *Stromer* in significant ways. First, unlike the present case, in which the facts have always been hotly contested, the facts in *Stromer* were undisputed. (268 Cal.App.2d at p. 518.) The significance of this point is highlighted by the observation, in a case following *Stromer,* that unqualified reversals contemplating a new trial "envision ' "a *re-examination of an issue of fact.*" ' " (*Moore* v. *City of Orange* (1985) 174 Cal.App.3d 31, 34 [219 Cal.Rptr. 301], quoting *Weightman* v. *Hadley, supra,* 138 Cal.App.2d at p. 838, italics added in *Moore.*) Where the facts of a case are undisputed, there is no reason for such a reexamination. ▮▮
▮▮ ▮▮ Second, Stromer was unable to elicit any new evidence upon which a judgment in his favor could have been supported, while here the Jewells vigorously insist that they have such evidence.[3] Finally, the *Kruse* opinion simply does not reveal a "patent" intent to order entry of judgment for the Bank. It is true, as the Bank urges, that some of the conclusive language in the opinion appears to reflect a belief that the weakness of the evidence could not be cured. At the same time, however, the opinion declares that, with respect to the Jewells, its holding was based "on the record before us." (*Kruse, supra,* 202 Cal.App.3d at p. 62.) Moreover, in analyzing the main factual issues raised by Mrs. Kruse, the opinion repeatedly refers to the failure of "the record" to furnish the necessary evidence. (*Id.,* at p. 63.) The court's heavy reliance on the record before it is

---

[3] The existence or nonexistence of new evidence is not directly relevant to the determination of a prior court's intent, since there is no occasion to present new evidence until after that court reaches its decision. It is relevant, however, to a consideration whether retrial would serve any purpose. Under the doctrine of law of the case, the effect of an appellate decision that the trial court judgment was not supported by sufficient evidence is conclusive in further litigation unless evidence is produced at a subsequent trial which is "materially," "essentially," or "substantially" different from that passed upon in the first appeal. (*Estate of Baird* (1924) 193 Cal. 225, 236 [223 P. 974]; *In re Marriage of Steinberg* (1977) 66 Cal.App.3d 815, 821 [136 Cal.Rptr. 299]; *Stromer* v. *Browning, supra,* 268 Cal.App.2d at p. 521.) Evidence merely cumulative to that previously presented is not sufficient to avoid the law of the case. (*Estate of Baird, supra,* 193 Cal. at p. 245.)

We need not decide, and intend no implication, whether the proffered evidence in the present case would be sufficient to overcome the law of the case.

not in harmony with an intent to foreclose retrial and the production of another record. In *Erlin*, the Supreme Court noted, "The statement by this court in its opinion upon the former appeal that 'on the merits the plaintiff is not entitled to recover' could only refer to evidence then before the court." (7 Cal.2d at pp. 548-549.) Since the language used in *Kruse* is more explicitly based on the evidence then before the court than that in *Erlin,* and, as *Stromer* itself recognized, "judgment reversed" at the end of an opinion is "strong indication" of intent to set a case at large for retrial, we conclude that the intent expressed in *Kruse* is too ambiguous to come within the *Stromer* exception.

The three cases that have followed *Stromer* similarly appear to involve undisputed facts, a conclusive determination by the appellate court and a clear lack of new evidence to support a different result upon retrial. In *Moore* v. *City of Orange, supra,* 174 Cal.App.3d 31, the first appeal determined that a deputy city clerk who had been terminated without due process was not entitled to relief because her position was governed by a statute providing that deputy city clerks are appointed by and serve at the pleasure of the city clerk. Although the opinion concluded with an unqualified reversal, the court on the second appeal found the first one had intended entry of judgment in the city's favor, deriving this intent from the opinion's conclusive statement that Moore had no constitutionally protected property interest in her position and could be discharged without cause. (*Id.*, at pp. 36-37.) The facts in *Moore* were undisputed (*id.,* at p. 35); the prior appeal rejected Moore's sole legal contention, that a municipal resolution took her position outside the purview of the statute. The only new evidence Moore offered was directed to an issue she had conceded in the first trial, and there was clearly no way a retrial could have avoided the effect of the prior appellate decision. (*Id.*, at pp. 35-37.) In these circumstances, it would have been senseless to follow the general rule that an unqualified reversal remands the case for a new trial.

The prior appellate opinion was similarly determinative in *Barth* v. *B.F. Goodrich Tire Co.* (1971) 15 Cal.App.3d 137 [92 Cal.Rptr. 809]. There, Barth's action for personal injuries against Goodrich, a tire manufacturer, and its distributor, P&W, resulted in a verdict against Goodrich and in favor of P&W; the former was affirmed on appeal and the latter reversed because of an erroneous jury instruction regarding strict liability. On appeal from the denial of Goodrich's motion to compel contribution from P&W, P&W argued that it had a right to relitigate the issue of its liability to Barth. The court found the first appellate decision had intended to establish P&W's liability without retrial because it had stated P&W was strictly liable as a distributor and supplier, there was no dispute that P&W was the distributor and supplier of the tire that caused the injury, and P&W had not pointed to any facts which could demonstrate the contrary on retrial.

Again, there was no reason to follow the general rule when no different result could possibly have been reached on retrial.

Finally, in *Salaman* v. *Bolt* (1977) 74 Cal.App.3d 907 [141 Cal.Rptr. 841], after Bolt obtained a judgment for attorney's fees against Salaman in an unlawful detainer action, the law firm that had represented him sought to impress a lien upon his cause of action for attorney's fees. The trial court denied the law firm's motion and the appellate court reversed. When Salaman tried to offset a judgment against Bolt in an unrelated action against Bolt's judgment, the trial court found the law firm's lien had priority, endorsed the lien and denied the offset. On the second appeal, the court rejected Salaman's contention that the trial court should have relitigated the law firm's entitlement to the lien. The court found in the decision on the first appeal a clear intent to require that the lien be impressed without further litigation: the decision held that the judgment lien statute should be liberally construed to give effect to the remedy it authorizes and concluded the trial court had abused its discretion in denying the lien, in circumstances where Bolt's and the law firm's judgments had become final and there was no allegation of fraud or collusion between the two. (*Id.*, at p. 915.)

While the general common law rule that an unqualified reversal has the effect of remanding a case for a new trial on all issues presented by the pleadings has been followed since before 1857 (*Stearns* v. *Aguirre* (1857) 7 Cal. 443, 448), the *Stromer* exception has been relied upon only infrequently. Perhaps one of the reasons judges do not often invoke the exception is that it depends on textual analysis of a prior opinion that may not even consciously, let alone unambiguously, address the subject of the present inquiry, and therefore cannot often be employed with confidence. In any case, the *Stromer* exception should not be applied in cases such as this, where the prior opinion does not unmistakably express an intent to bar retrial.

## II.

After the jury returned its verdict in *Kruse*, the Bank moved for judgment notwithstanding the verdict and a new trial; the trial court denied the former motion and granted the latter as to punitive damages only, conditioned upon real parties' acceptance of a remittitur. Division One then reversed the judgment for insufficiency of the evidence. Since the standard employed by an appellate court reviewing the sufficiency of the evidence is essentially the same as that used by a trial court considering a motion for directed verdict or judgment notwithstanding the verdict (see *Sanchez-Corea* v. *Bank of America* (1985) 38 Cal.3d 892, 906 [215 Cal.Rptr. 679, 701

P.2d 826]; *Hauter* v. *Zogarts* (1975) 14 Cal.3d 104, 110 [120 Cal.Rptr. 681, 534 P.2d 377, 74 A.A.L.R.3d 1282]; *Moore* v. *City & County of San Francisco* (1970) 5 Cal.App.3d 728, 733 [85 Cal.Rptr. 281]), Division One's reversal of the judgment for insufficiency of the evidence effectively determined that the trial court should have granted the Bank's motion for judgment notwithstanding the verdict. Under Code of Civil Procedure section 629,[4] "[i]f the motion for judgment notwithstanding the verdict be denied and if a new trial be denied, the appellate court shall, when it appears that the motion for judgment notwithstanding the verdict should have been granted, order judgment to be so entered on appeal from the judgment or from the order denying the motion for judgment notwithstanding the verdict." The effect of section 629 is that a reversal on appeal for insufficiency of the evidence concludes the litigation just as it would have been concluded if the trial court had correctly entered judgment notwithstanding the verdict.

Had Division One applied section 629 in *Kruse,* this matter would not be before us. Having determined that there was no substantial evidence to support the judgment, Division One would have been required by the terms of the statute to order entry of judgment in favor of the Bank. The Bank, however, neither urged application of section 629 in its appeal nor sought clarification of the *Kruse* opinion to direct entry of judgment in accordance with section 629 by means of petition for rehearing. The Bank does not suggest that section 629 applies in the present writ proceeding, although it urges us to consider the policy reflected by the statute.[5]

Indeed, direct reliance upon section 629 would be misplaced for several reasons. First, the statute directs the *appellate court* to order entry of judgment in the prescribed circumstances. This proceeding, however, arose from the Bank's request that the *trial court* enter judgment in its favor. By the terms of the statute, the trial court simply had no power to implement section 629; had it done so, it would have been improperly correcting the appellate court's failure to comply with the statute. Second, the statute applies "on appeal from the judgment or from the order denying the motion for judgment notwithstanding the verdict." Under this language, section 629 could only apply within the context of the appeal from the judgment considered by Division One and not to an appeal, much less a writ proceeding, from a subsequent trial court order. Finally, once the remittitur issued

---

[4] All further statutory references will be to the Code of Civil Procedure unless otherwise specified.

[5] The Bank did not raise section 629 at all either in the court below or in its petition, but only *after* real parties' opposition to the petition argued that the statute could not be applied to this case. At oral argument, counsel for the Bank acknowledged that there were "timing problems" with applying the statute at this juncture and specifically declined to rely upon it.

in *Kruse,* this court lost jurisdiction to apply section 629 directly. ■ "Other than for the correction of clerical errors, the recall [of the remittitur] may be ordered on the ground of fraud, mistake or inadvertence. The recall may not be granted to correct judicial error. [Citations omitted.] . . . [A] decision is inadvertent if it is the result of oversight, neglect or accident, as distinguished from judicial error." (*Southwestern Inv. Corp.* v. *City of L. A.* (1952) 38 Cal.2d 623, 626 [241 P.2d 985].) In *Chin Ott Wong* v. *Title Ins. & Trust Co.* (1949) 91 Cal.App.2d 1 [204 P.2d 387], the appellate court recalled the remittitur and "corrected" its opinion by adding to its concluding clause, " 'with directions to the court below to enter judgment for the defendants.' " (*Id.,* at p. 2.) The court later granted a motion to recall the remittitur and vacate these orders, stating that "assuming the state of the record on appeal would have warranted the directions to enter judgment in favor of appellants, such directions were not given, and any attempt upon our part to give such directions now in effect amounts to an amendment of the judgment on appeal and the opinion upon which it was based after the court had lost jurisdiction. After our decision became final . . . such decision, in its legal aspect, stood in the same position as any other case in which an erroneous decision may chance to have been made by the court." (*Id.,* at p. 3.) In short, since the *Kruse* opinion became final without section 629 having been raised or considered, it is simply too late to apply the statute to this action.

■ Nevertheless, given the existence of section 629 and the statutory policy it reflects, it would be anomalous to follow the unqualified reversal rule in the circumstances of this case. As has been stated, Division One's resolution of the former appeal means the trial court should have granted the Bank's motion for judgment notwithstanding the verdict, *which would have precluded retrial.* Under the general unqualified reversal rule, however, the failure of Division One to direct entry of judgment would fortuitously confer upon real parties the right to relitigate their action even though the court's determination necessarily meant that the trial court should have granted the Bank's motion for judgment notwithstanding the verdict. In other words, the effect of the general rule in a situation such as this is that the trial court's error affords plaintiffs a second chance to prove their case which they would not have had if the trial court had acted correctly.

We are aware of no California case discussing whether judgment should be entered for the party prevailing on appeal when the appellate court reverses a judgment for insufficiency of the evidence after the trial court denied a motion for judgment notwithstanding the verdict and our review has uncovered no cases applying the unqualified reversal rule in such a situation. Section 629 was designed to prevent application of the general rule permitting retrial after an unqualified reversal by ensuring the entry of

judgment in favor of a party whose motion for judgment notwithstanding the verdict was erroneously denied at trial. Though, as earlier explained, section 629 can no longer be applied to this case, the reasoning that gave rise to it continues to provide a sufficient basis upon which to avoid the anomaly that would otherwise result. Like the court in *Stromer,* we view the unqualified reversal rule as a general rule subject to limitations. *Stromer* created its exception to avoid applying the general rule to defeat the manifest intent of the appellate court to disallow retrial. It would be just as unreasonable to allow retrial under the general rule in a case where, but for the trial court's erroneous denial of the Bank's motion for judgment notwithstanding the verdict and the Court of Appeal's failure to comply with section 629 (which inexplicably was never called to its attention by the Bank), real parties would clearly have lost their right to another day in court. There is no compelling policy reason to restore it to them. As our Supreme Court recently pointed out in a different context, the need to enhance the finality of judgments and avoid "an unending roundelay of litigation," makes it "necessary that litigants assume responsibility for the complete litigation of their cause during the proceedings." (*Silberg* v. *Anderson* (1990) 50 Cal.3d 205, 214 [266 Cal.Rptr. 638, 786 P.2d 365].) The present case, which commenced nearly a decade ago, has been exhaustively litigated. We cannot assume real parties failed to marshal the best evidence, because the entry of judgment notwithstanding the verdict must ordinarily be predicated on the assumption that the party against whom the motion is made has presented the strongest possible case. Accordingly, we hold that the unqualified reversal rule has no application in a case where a motion for judgment notwithstanding the verdict was made and denied by the trial court, and the appellate court reverses the judgment for insufficiency of the evidence.[6]

---

[6] In her petition for rehearing, Mrs. Kruse raises an alternative argument predicated on the fact that Division One reversed the judgment not only because of the insufficiency of the evidence, but on the basis of inconsistent verdicts. This argument is so peripheral to those previously relied upon by real parties in this writ proceeding that we could deem it untimely under the "settled rule 'that points made for the first time on petition for rehearing will not be considered.' " (*County of Sacramento* v. *Loeb* (1984) 160 Cal.App.3d 446, 459-460, fn. 5 [206 Cal.Rptr. 626], quoting *A. F. Estabrook Co.* v. *Industrial Acc. Com.* (1918) 177 Cal. 767, 771 [177 P. 848].) Giving real parties the benefit of the doubt, we elect to consider their newly developed argument on the merits.

The new argument emphasizes that Division One reversed in part on the independent ground of the "material inconsistency in the jury's verdicts" in favor of both Mrs. Kruse and the Jewells. (*Kruse* v. *Bank of America, supra*, 202 Cal.App.3d at p. 65.) Pointing out that reversal for inconsistent verdicts requires remand for new trial (*Morris* v. *McCauley's Quality Transmission Service* (1976) 60 Cal.App.3d 964, 973 [132 Cal.Rptr. 37]), Kruse argues that there is no legal authority, "or even any sound and just reason, to establish that Mrs. Kruse and the Jewells are not entitled to a new trial after reversal on the ground of inconsistent verdicts merely because their judgments were also reversed on the grounds of insufficiency of the evidence." The problem with this argument is that the appellate finding of inconsistent verdicts does not, in this case, stand alone. The concomitant determination that the evidence

Our conclusion that judgment should have been entered for the Bank makes it unnecessary to determine whether real parties' claims would be barred by law of the case if the action were retried and whether the court abused its discretion in allowing real parties to amend their pleadings.

Let a peremptory writ of mandate issue commanding respondent court to set aside its orders of June 19 and 23, 1989, denying the Bank's motion for entry of judgment and granting real parties Kruse and the Jewells leave to amend their complaint and cross-complaint, respectively, and to issue a new and different order granting the Bank's motion for entry of judgment, denying real parties' motions for leave to amend, and granting judgment in favor of the Bank.

Peterson, J., and King, J.,* concurred.

A petition for a rehearing was denied June 14, 1990, and the opinion was modified to read as printed above. The petition of real parties in interest for review by the Supreme Court was denied September 13, 1990. Lucas, C. J., and Panelli, J., did not participate therein.

---

was insufficient to support *both* of the verdicts, however inconsistent, is, as we have explained, tantamount to a finding that the Bank's motion for judgment notwithstanding the verdicts should have been granted at trial, thereby precluding retrial. Thus, the inconsistency in the verdicts is for present purposes immaterial. A person shot in the heart and the foot does not survive because one of the wounds was relatively inconsequential.

 * Assigned by the Chairperson of the Judicial Council.