Filed 11/30/21  Webb v. General Cable Corp. CA1/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| AMOS WEBB et al.,<br><br>        Plaintiffs and Respondents,<br>v.<br><br>GENERAL CABLE CORPORATION,<br>        Defendant and Appellant. | A159632, A159747<br><br>(Alameda County<br>Super. Ct. No. RG18925553) |

Defendant General Cable Corporation (defendant or General Cable) appeals from a jury verdict in favor of plaintiffs Amos Webb and his wife on their complaint for personal injury and loss of consortium.  Defendant raises several claims of error, including that (1) plaintiffs failed to present substantial evidence that plaintiff Amos Webb (hereafter Webb) was exposed to products manufactured by defendant that contained asbestos; (2) plaintiffs' evidence of medical causation was based on assumptions unsupported by the facts; (3) the jury's allocation of fault among defendants was not supported by substantial evidence; and (4) the jury's $11.5 million verdict for future noneconomic damages was excessive as a matter of law.

After a review of the entire appellate record, we agree with defendant that plaintiffs failed to present substantial evidence Webb was exposed to products manufactured by defendant that contained asbestos.  Because the

jury would be required to speculate to find in plaintiffs' favor, we conclude the judgment is not supported by sufficient evidence and reverse.

## I.  BACKGROUND

### A.  *Plaintiffs' Lawsuit*

Webb was diagnosed with mesothelioma in 2018.  He and his wife, Jeannie Webb, filed this action against defendants General Cable Corporation and 26 other defendants, alleging, among other causes of action, negligence, strict liability, and loss of consortium based on his exposure to asbestos as an electrician for various employers at various worksites over the course of his career.

### B.  *Evidence at Trial*

#### 1.  *Webb's Work as an Electrician*

In 1959, Webb went to work as an apprentice electrician for Littles Electric (Littles) in Berkeley.  Littles was a small electrical contractor that did remodeling, new residential, and commercial construction work.

Webb worked as an apprentice at Littles for about three years.  He advanced quickly to become the foreman of the company, and remained employed at Littles until approximately 1973.

##### a.  **Webb's work with Romex wire**

While he worked at Littles, Webb worked "quite frequently" with a product known as "Romex wire."  In fact, during his first three or four years of his employment, "it was mostly Romex."

Romex was a popular brand of cable used for interior wiring.  General Cable acquired the trademark for "Romex" brand wire in 1944.  Romex consisted of a nonmetallic sheathed cable containing multiple wires.

Multiple witnesses at trial confirmed that Romex was both a trade name for one particular manufacturer's electrical wire or cable,[1] but it was also a generic term, "like someone saying, give me some Kleenex. If they give you Puffs, it's still Kleenex." One of plaintiffs' experts confirmed that many companies manufacture what one might call "Romex," as that name refers "to a type of cable that has an external sheathing." Defendant's expert agreed Romex was both a brand name and generically understood as a type of wire.

For the first three years he worked at Littles as an apprentice, Webb did not purchase electrical wire, but picked it up from suppliers. In about 1962, Webb began doing his own ordering. About 60 percent of the wire he ordered when he worked at Littles was from General Cable and about 40 percent was from other manufacturers.

Webb testified that "Romex" was a brand of wire. Webb "worked with Romex that was made by General Cable." He knew he was working with the brand "Romex" wire because he saw "Romex" written on the box. The Romex that Webb worked with came in different colors, but "[m]ost of the time back in the olden days, most of it was gray—grayish wire with a grayish—gray-type cover on the outside, and . . . . a fiber—a white fiber in it that [he] would have to trim and get off."

When working with Romex, Webb would use a utility knife or a wire stripper to cut back the outer layer of insulation and scrape the wires to establish a good electrical connection. Webb would "take a utility knife and cut the outer layer with the knife, peel it off." He testified, "[I]t's the same with the smaller wires. They had the insulation—I mean, the covering on the

---

[1] Webb confirmed that Romex is technically a "cable" because it contains multiple strands of wire, but plaintiffs' expert, Charles Ay, described Romex as a "wiring system," not cable.

3

outside, take the paper off.  And then it also had white fiber in it that we would have to cut, and most electricians just cut it and throw it on the floor . . . .”

Webb was working close to the wires when trimming, stripping, and scraping them.[2]  He was also exposed to dust when cleaning up the debris from his work with wires.  “We use a dust pan and a broom to sweep it all together and put it in a container and put the trash away. [¶] . . . [¶] . . . anytime you’d do the cleanup, sweeping and things, you would create some type of dust or something, you know.”

Webb was not wearing any protective gear with respect to breathing when doing this work.  Webb was never warned by Littles about wiring having asbestos, nor did he see any warnings on packaging from General Cable.  Defendant admitted it was “unaware of any warnings placed on its products relating to asbestos health hazards.”

### b.  Webb’s work with “heat wire”

 In his work as an electrician, Webb “hooked up” appliances that had “high-heat wire,” such as bathroom heaters, heat lamps, ovens, and range tops.  Webb would use Romex or “other wire” to hook up high-heat appliances because “different jobs come with different applications.”

Webb explained for example, how he would “hook up” an oven:  “Your oven, you would have to bring your line in to accommodate the load that the oven would require in order to operate.  So you did that with a . . . Number 8 wire . . . . [¶] So you bring that in, and you come into a junction box and you

---

[2] Plaintiffs’ expert explained that Webb would have been exposed to asbestos fibers when cutting the ends of wires and stripping them back, and testified that when cutting, stripping, and hooking up wires, electricians are “within 8, 10, 12 inches of this, and our normal breathing zone is an 18-inch umbrella. . . . So you’re definitely going to inhale those fibers.”

have an oven that recesses into the cabinet.  And with that oven, it comes with a pigtail that—the pigtail have [*sic*] highly resistant heat wire that come into that you have to trim the wire and cut the insulation back, and make a termination into the junction box."  Similarly, with a "range top," Webb would "bring in the line for that," "put a junction box in," "put your cable in through the connector  and strip back the wire that have the high-heat resistant [*sic*] because the wire that we have that come in Romex, which would be TW, and then you make a connection . . . and then you . . . connect that cable into the panel."

Asked to clarify what "pigtail" is, Webb explained, "[T]he appliance come with a pigtail, if a piece of equipment come with a pigtail, that mean it's got flexible cable.  It could be liquid-type flex or just regular flex.  And this is—it's still wrapped in a piece of flexible conduit, and that would come in with a connector on the end, and as a matter of fact, be it Westinghouse or GE or whoever made the appliance, it would already be installed, the wires necessary to make that appliance work."  Webb would then "have to accommodate that.  So when we put that in the junction box, we terminate their wire with our wire in order to have continuity from the breaker all the way through the appliance."

When asked whether he used wire manufactured by General Cable for "high-temperature applications," Webb said:  "For the high-temperature wire, it's very seldom we would get high-temperature wire to pull in to accommodate appliance unit and things.  With Romex and things of this sort, it was already on the—it was put in by others."  When asked to explain further, Webb responded:  "It was put in by whoever made the appliance or the unit that we was [*sic*] wiring. [¶] . . . [¶] They put that in there for it to be

5

hooked up.  And we had to terminate it by stripping it and hooking it to the wire we bring in. [¶] . . . [¶] We didn't put no wires in.  They did."

For a commercial job, Webb "would run conduit pipe called 'EMT,' and then you put that in, and this is a situation where you have to run a fishtail through it to pull your cable, your wires through, which would be both—both times it's THW.  THWN would carry more heat. [¶] Then you could—if you could carry more heat, you didn't have to have a larger conductor to conduct the electricity, depending on what application you wanted to use.  So you bring that to the junction box, and the same way you would do with the Romex pretty much, but then you would make a splice into the junction box and then put your high-heat wires to this wire and go from there."

In addition to Romex, Webb used "TW wire, THW, THWN."  Webb explained "[t]hese are different insulation that's on the different wires that we put through a conduit pipe."

### 2.  Plaintiffs' Certified Asbestos Consultant's Testimony

Charles Ay, a California certified asbestos consultant, testified for plaintiffs as an expert about "the different types of products that contained asbestos, and how [Webb,] in performing his work, would have had an opportunity for exposure to that asbestos."  To obtain his certification, Ay satisfied a protocol established by the federal Asbestos Hazard Emergency Response Act.  As part of his training, Ay learned about what products were historically made with asbestos during the period 1955 to 1978.

Ay learned about the work of electricians from 1959 to 1978 by personally observing them on job sites and reading depositions of electricians. According to Ay, "a lot" of wire used by electricians during that time contained asbestos.  Residential electricians were generally at risk of occupational exposure to asbestos "[f]rom [their] own work, some of the cable

6

wire that [they are] pulling is an asbestos-containing product. And the handling of that wire, the preparation of that wire, the hooking up of that wire, if you will, causes fiber to be released when [they are] handling and working with an asbestos product that generates dust."

Ay stated that the only potential exposure Webb had to asbestos from wire during the 1955 to 1978 time period came from Romex or from heat wire. Ay testified that heat wire and Romex are "completely different" products.

Ay described Romex as a "type of wire that the household person knows what it is. It's something you use in your house if you're doing some electrical work."[3]

Ay tested Romex wire used in the 1950's and early 1960's and found some Romex wire from 1959 to 1962 had asbestos. The product in which he found asbestos had wires that were "black [with] a silver coating" and the silver coating contained asbestos. Ay elaborated: "If you look at Romex today, it's a white plastic-looking material. . . . [¶] [B]ack . . . in the '50s, that wasn't plastic. That was made of a woven material, and so you would cut that woven material away. Then there is this packing material. Today it looks like brown paper, but back then there [were] other products that were used, and so you would pull that away. Then you would strip the wire. And so the asbestos on the old Romex—it was black in color instead of white—and some of that Romex had a silver—it looked like it was—had a silver coating on it. And that silver coating historically was asbestos-containing. [¶] So when you're pulling and stripping, you're abrading that silver material that

---

[3] Ay opined that while homeowners might use the term Romex generically to describe a type of cable or wire rather than a brand name, "an electrician would know the difference."

causes it to flake off, and when you abrade it, it causes fiber to be released into the air. And if you're breathing that air, then you are exposed."

Ay stated that he did not perform any testing for purposes of this lawsuit, did not test any of the products Webb worked with, and did not visit any of Webb's worksites. Though he had done testing of Romex wire in the past, he did not bring photographs, samples of wire, or results of his tests to trial, nor did he have any notes from the tests he performed.

Ay also admitted he did not know or research who manufactured the brand name "Romex." When asked to list the manufacturers of wire that had asbestos in it between 1957 and 1978, Ay testified he had "done a lot of research on it" and "a lot of testing on wires." He opined, "There's [*sic*] probably at least 20 manufacturers that made wire that was associated with asbestos." He did not look at formula sheets, patents, or trademark applications for General Cable products.

In addition to Romex, Ay testified "heat wire" contained asbestos. He stated, "I don't think I found one that did not have asbestos during the relevant time period. They all contained asbestos." Ay confirmed that "heat wire" is integral to the appliance itself. He explained: "[Y]ou have an electric stove that, because of the heat that's generated in there, the wiring within the stove itself and when you tie into that, that has an insulator on the—on the wire itself. That insulator is made with asbestos. So when you strip that off and—if you're working, you strip it off, it falls to the ground while you're standing there shuffling your feet, doing your work you're grinding that material up, and that material is an asbestos-containing material. [¶] They put heat lamps in bathrooms or electric heaters in homes. Those electric heaters had asbestos cabling or wiring, and so in order to hook them up, you had to strip that. [¶] The wire itself, when you were pulling the wire, it's an

8

asbestos-containing fibrous material that gets abraded when you're pulling it and it causes fiber to be released."

As to General Cable specifically, Ay testified "[t]hey made a good product" and "they were large in the industry." He stated they "made wire that was used in the commercial and marine industry. In the marine industry it contained asbestos. In the commercial industry the Romex contained asbestos. Their heat wire contained asbestos." As to heat wire specifically, Ay testified their asbestos-containing heat wire would be used "for any of your electric heaters, heat lamps, things like that, ovens, stoves, anywhere you're going to generate heat."

Ay opined based on his review of Webb's deposition testimony that "[t]here's no question he would have been exposed to elevated levels of asbestos." When asked specifically whether he had any opinion in regard to General Cable as to Webb, however, Ay responded: "Other than he identified it as a product he used, he identified—and that was basically it for what he said I used, you know, General Cable. And then he mentioned a lot of material, equipment that he used that was made by people other than General. But that was it. He didn't go into the asbestos aspects because, at the time, he was not aware that they contained asbestos or that asbestos was being released." When asked whether he had an opinion that the General Cable wire that Webb was using contained asbestos, Ay stated: "Again, beyond what I've already stated, no. The wire, depending on the wire that you were using contained asbestos. If it was Romex, black with a silver coating, there was no question about it, it was an asbestos-containing material."

9

### 3. *General Cable's Special Interrogatory Responses*

Plaintiffs' counsel read into the record at trial defendant's responses to several interrogatories.

In response to interrogatory No. 30, asking whether defendant had engaged in a variety of specific activities with regard to asbestos-containing products between 1930 and 1985, defendant stated it "manufactured and marketed a specialty brand wire which contained asbestos as an insulation. Such asbestos was totally encapsulated and saturated with flame retardant and water-resistant materials." Defendant responded that its "first information of marketing such a product occurs in 1933," and further stated that "while the amount of production of said specialty product was quite low, it appears that all manufacturing of said product ended sometime in the late 1960s or very early in the 1970s."

In response to another interrogatory seeking further information about defendant's asbestos-containing products and activities, defendant incorporated its response to interrogatory No. 30, and further stated that: "[A]ny use of small amounts of fully encapsulated asbestos as an insulating material in a minimal amount of General Cable Corporation's specialty products ended not later than March 31st, 1978, when General Cable Corporation's power and control division was sold to Pirelli Cable Corporation.

"The small amount of fully encapsulated asbestos that may have been used as an insulating material on wire and cable products sold by General Cable Corporation would have been manufactured using chrysotile, CY asbestos.

"It is believed that the insulation on said wire and cable products would have contained between 20 percent and 30 percent fully encapsulated

chrysotile asbestos, between 60 percent and 70 percent of cellulose binding materials with the remainder being other nonasbestos materials."

### *4.  General Cable's Person Most Knowledgeable Testimony*

At trial, plaintiffs' counsel also read the August 29, 2007 deposition testimony of defendant's person most knowledgeable, Carlos Katz.  Katz testified that he knew General Cable was producing asbestos-containing wire when he went to work for them in the early 1960's.  When asked if he had "any knowledge as to what type of asbestos fiber was used with insulation of the asbestos wiring from General Cable at any point in time," Katz responded,  "Yes, I know it was crysolite [*sic*], I think that's the way you pronounce it."

## C.  Jury Verdict

The jury found in favor of plaintiffs on their negligence, failure to warn, and product liability claims.  The jury rejected an award of punitive damages, finding defendant did not act with malice, oppression, or fraud.

The jury awarded Amos Webb $343,226.57 for past medical expenses, $2.5 million for future medical expenses, $592,737 for nonmedical economic damages, $2.25 million for past noneconomic damages from the time of Webb's diagnosis in 2018 to the time of trial in 2019, and $11.25 million for future noneconomic damages.  The jury awarded Jeannie Webb $11.5 million for loss of consortium.

The jury apportioned damages among 11 defendants.  They assigned General Cable 39 percent fault and allocated the remaining 61 percent fault among other defendants.  The court entered judgment in favor of plaintiffs.

## D.  Defendant's Posttrial Motions

Defendant moved for judgment notwithstanding the verdict on the grounds that plaintiffs failed to establish Webb was exposed to asbestos

11

attributable to General Cable and failed to establish Webb's mesothelioma was caused by exposure to any General Cable product. Defendant filed a motion for new trial raising the same issues and arguing, among other things, that that the $11.25 million award for Webb's future noneconomic damages was excessive and the evidence insufficient to support the jury's 39 percent fault allocation to defendant.

The trial court denied both motions. The court did, however, grant partial judgment notwithstanding the verdict on the damages award for future medical expenses, reducing the award from $2.5 million to $100,000 based on plaintiffs' expert's uncontradicted testimony.

Defendant timely appealed.

## II. DISCUSSION

Defendant first argues that the judgment must be reversed because plaintiffs did not present substantial evidence that Webb was exposed to asbestos from any General Cable wire. As we explain, we agree.

### A. *Applicable Law*

To prove exposure to asbestos from a particular product was a legal cause of a plaintiff's injury, the plaintiff must satisfy the two-part test enunciated by our Supreme Court in *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953 (*Rutherford*). "[T]he plaintiff must first establish some threshold exposure to the defendant's defective asbestos-containing products, and must further establish in reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a substantial factor in bringing about the injury." (*Id.* at p. 982, fn. omitted, italics omitted; *Berg v. Colgate-Palmolive Co.* (2019) 42 Cal.App.5th 630, 635.) The plaintiff bears the burden of proof on the issue of threshold

12

exposure.  (*Rutherford*, at pp. 968, 975–976; *McGonnell v. Kaiser Gypsum Co., Inc.* (2002) 98 Cal.App.4th 1098, 1103.)

"If an asbestos plaintiff fails to prove exposure, there is no causation and no liability as a matter of law."  (*LAOSD Asbestos Cases* (2020) 44 Cal.App.5th 475, 488; *Collin v. CalPortland Co.* (2014) 228 Cal.App.4th 582, 589.)  Circumstantial evidence that raises "[t]he mere 'possibility' of exposure" is insufficient.  (*Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 108; *Berg v. Colgate-Palmolive Co.*, *supra*, 42 Cal.App.5th at p. 637.)

"We review a jury's causation finding for substantial evidence."  (*Izell v. Union Carbide Corp.* (2014) 231 Cal.App.4th 962, 969.)  In doing so, we consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in support of the judgment.  (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630.)

## B.  Analysis

Defendant contends plaintiffs failed to meet their burden on the threshold issue of exposure because their evidence showed "at most a *possibility* of exposure attributable to General Cable."

As discussed above, to prove causation a plaintiff must first establish some threshold exposure to a defendant's asbestos-containing products.  (*Rutherford, supra,* 16 Cal.4th at p. 982.)  Plaintiffs' claims against defendant were premised entirely on Webb's exposure to asbestos through Romex and heat wire manufactured by defendant.  But plaintiffs offered no substantial evidence that (1) General Cable manufactured Romex that contained asbestos or (2) Webb used any heat wire manufactured by General Cable.

13

### 1. *Romex*

The only witness to testify that any type of Romex contained asbestos was plaintiffs' expert, Charles Ay. Ay conducted tests on wire used in the 1950's and 1960's, and found "some" asbestos-containing Romex wire from 1959 to 1962 that was black with a silver coating. But Ay did not testify defendant manufactured the wires he tested, nor did he know or research who manufactured Romex between 1959 and 1977. Ay conceded he conducted no tests in connection with this lawsuit. He did not bring notes, photographs, samples of wire, or results from his testing to trial. He did not visit any of Webb's worksites nor test any of the products Webb worked with. When asked to name manufacturers of wire that had asbestos between 1957 and 1978, Ay did not mention General Cable, despite having done "a lot of research on it" and "a lot of testing on wires." He did not look at formula sheets, patents, or trademark applications for General Cable products.

Ay never offered an opinion that he knew the black-and-silver wire in which he found asbestos was manufactured by General Cable or that it was Romex brand wire as opposed to generic Romex cable. When asked if he had an opinion about whether Webb's work with General Cable products exposed him to asbestos, Ay said, "Again, beyond what I've already stated, no. The wire, *depending on the wire that you were using* contained asbestos. If it was Romex, black with a silver coating, there was no question about it, it was an asbestos-containing material." (Italics added.)

Webb, on the other hand, offered substantial evidence that he worked with General Cable's Romex brand wire, but he did not know whether it contained asbestos. Webb described the Romex he worked with as "grayish wire with a grayish—gray-type cover." Moreover, Webb described the Romex he used as "cables that had a little white fiber inside of them." But Ay

testified that the asbestos-containing Romex was black and silver, and did not contain interior asbestos packing. According to Ay, the asbestos was in a silver coating that flaked off when scraped.

We find *Berg v. Colgate-Palmolive Co.*, *supra*, 42 Cal.App.5th 630 (*Berg*) instructive here. In *Berg*, the plaintiff alleged he was exposed to asbestos from 1959 to 1962, when he used defendant's talc shaving product. (*Id.* at p. 632.) The defendant moved for summary judgment, arguing the plaintiffs could not establish the particular shave talc Berg had used contained asbestos. In opposition to the summary judgment motion, the plaintiffs relied on an expert declaration stating some of the talc manufactured by the defendant came from mines contaminated with asbestos, and that Food and Drug Administration testing in 1972 had detected the presence of asbestos in shave talc manufactured by the defendant. (*Id.* at p. 632.) The expert also personally tested samples of the defendant's shaving talc in 2016 and 2018 in containers that were "consistent with Berg's description of the containers he remembered using." (*Id.* at p. 633.) The trial court granted summary judgment, concluding the plaintiffs' expert declaration did not meet their burden to demonstrate the existence of a triable issue of fact regarding Berg's exposure to asbestos through the defendant's products. (*Id.* at pp. 633–634.)

A different panel of this court affirmed, ruling, "It was not enough for plaintiffs to produce some evidence that Berg was exposed to a product that possibly contained asbestos." (*Berg*, *supra*, 42 Cal.App.5th at p. 637.) First, because Berg alleged he had been exposed to asbestos from other products and had used the shave talc a short time, "his eventual development of mesothelioma provide[d] much weaker support for an inference that the shave talc he used contained asbestos." (*Id.* at p. 636.) "More importantly,"

15

however, the plaintiffs did not present evidence that "all or most of the Mennen Shave Talc containers sold from 1959 to 1962 contained asbestos." (*Ibid.*) As a result, the "only basis on which to conclude that the samples tested were of the correct vintage was Berg's testimony that the containers [the expert] tested looked like the ones he used." (*Ibid.*) Such testimony fell "far short" of satisfying the plaintiffs' burden. (*Id.* at pp. 636–637.)

The expert testimony plaintiffs presented in this case is even more speculative than the evidence in *Berg*. Ay did not testify he sampled any of *defendant's* Romex wire for asbestos; nor did he testify that all or most Romex manufactured between 1959 and 1962 contained asbestos.[4] Rather, Ay found that "some" Romex wire from 1959 to 1962 that was black with a silver coating contained asbestos. And unlike in *Berg*, here, the witnesses' testimony did not even establish that the product Ay tested looked the same as the product Webb used. (See *Berg*, *supra*, 42 Cal.App.5th at p. 636.) Ay testified the asbestos-containing Romex he tested was black with a silver coating, while Webb testified the Romex wire he used was gray with a gray cover.[5] Without more, the jury could not reasonably infer that the General

---

[4] Further, like the plaintiffs in *Berg*, plaintiffs here presented evidence Webb was exposed to asbestos from other sources. Ay testified, for example, that Webb was "working around other crafts and trades. So he has some drywall exposure, some roofing felt exposure, some flooring exposure. . . . ventilation systems exposure. So he's got—a lot of other products that we find in our homes that contained asbestos, he would have an exposure to them also."

[5] Plaintiffs contend this inconsistency goes to the weight of the evidence and argue that a jury may accept part of the testimony of a witness and reject another part even though the latter contradicts the part accepted. As defendant points out, however, rejecting testimony "has the effect only 'of removing that testimony from the evidentiary mix. Without more, the disregard or disbelief of the testimony of a witness is not affirmative evidence of a contrary conclusion.' " (*Moran v. Foster Wheeler Energy Corp.* (2016)

Cable Romex wire Webb used was the same type of wire Ay tested that contained asbestos, but would have to speculate to reach that conclusion. (*Berg*, at p. 637 [" 'speculation' that the product [the plaintiff] used might have contained asbestos is insufficient"]; *Izell v. Union Carbide Corp.*, *supra*, 231 Cal.App.4th at p. 969 [" '[P]roof that raises mere speculation, suspicion, surmise, guess or conjecture is not enough to sustain [the plaintiff's] burden' of persuasion."]; compare *Strobel v. Johnson & Johnson* (2021) 70 Cal.App.5th 796, 814 [plaintiff established triable issue of fact on asbestos exposure where expert "proffered testimony that his lab conducted bulk testing of Cashmere Bouquet product and concluded that '[t]he results of such testing are consistent with the makeup of the product, the ore, and the geology of the talc sources used by its manufacturer, Colgate' "].) Thus, even taken together and construed liberally in favor of plaintiffs, such evidence is not sufficient to support a finding Webb was exposed to asbestos when he used General Cable's Romex wire.

Plaintiffs also point to defendant's interrogatory responses as substantial evidence that General Cable's Romex wire contained asbestos. Defendant admitted it "manufactured and marketed *a specialty brand wire* which contained asbestos as an insulation." (Italics added.) Plaintiffs urge us to construe this statement as a concession that *all* of defendant's products were for "specialty" applications and contained asbestos. But the inferences that constitute substantial evidence are those that can reasonably be drawn from the evidence. (See, e.g., *Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633 ["While substantial evidence may consist of

---

246 Cal.App.4th 500, 518.) Assuming the jury rejected Webb's description of the color of wire he used, the elimination of that testimony is not substantial evidence that he used the wire Ay tested.

inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' "; " 'A decision supported by a mere scintilla of evidence need not be affirmed on review.' "].)  Here, defendant's response further stated, "the amount of production of said specialty product was quite low." The interrogatory response makes no mention of Romex, a popular product widely used for general interior wiring.[6]  Defendant's interrogatory responses also pointed to "copies of [its] catalogs for the relevant time period showing the marketing of various General Cable Corporation products, including specialty brand products which may have included asbestos content as insulation."  Further, defendant admitted "asbestos was used in certain products primarily shipboard cable pursuant to government specifications . . . ."  None of this evidence, however, supports a logical inference that defendant's *Romex* cable contained asbestos.

Plaintiffs also rely on testimony from Carlos Katz, defendant's person most knowledgeable, and state he "confirmed the broad use of asbestos."  But Katz testified that General Cable used asbestos for wire in high-heat applications, not Romex.  As even Ay agreed, heat wire and Romex are "completely different products." In sum, our review of the entire record discloses no substantial evidence Webb was exposed to asbestos from defendant's Romex.

### 2. Heat Wire

Plaintiffs likewise failed to present any substantial evidence that Webb was exposed to asbestos from heat wire manufactured by General Cable.

---

[6] Ay explained, "Romex is a type of wire that the household person knows what it is.  It's something you use in your house if you're doing some electrical work."  He also explained it is a product one could buy at a "hardware store, or Home Depot, whatever you want" and get it either off a spool or in a box.

Ay testified that certain high-heat appliances, such as ovens, ranges, electric heaters, and heat lamps used wire insulated with asbestos to protect against the heat. Webb and Ay described such wire as heat wire. Webb also called heat wire "pigtail," because it looked a bit like a pig's tail where it stuck out of the appliance.

Both Ay and Webb testified that the heat wire used in high-heat appliances came with the appliance. Webb stated, "The high-heat application [*sic*] had their own wire inside of it already there for us to hook it up." Ay agreed the heat wire was "integral to the appliance." Plaintiffs presented no evidence that General Cable supplied any heat wire to any of the manufacturers of appliances that Webb installed.

Plaintiffs point to Webb's testimony at trial affirming that the wire he brought in *to hook up to* the preinstalled, high-temperature wire was manufactured by General Cable, but Webb did not testify that wire was *heat wire*.[7] To connect a high-heat appliance, Webb would first run its preinstalled heat wire, or "pigtail," to a junction box. He would then run wire from the walls, such as Romex wire, through a connector to the junction box. Elaborating how he would hook up appliances in a kitchen, for example, Webb testified: "Let's start with your oven. Your oven, you would have to bring your line in to accommodate the load that the oven would require in order to operate. *So you did that with . . . Number 8 wire . . . .* [¶] So you bring that in, and you come into a junction box and you have an oven that recesses into the cabinet. And with that oven, *it comes with a pigtail* that— *the pigtail have* [*sic*] *highly resistant heat wire* that comes into that you have

_____

[7] After explaining that appliances would come with a wire already installed, Webb was asked: "Okay. But the wire you brought in to hook up to these high-temperature wires, right, that was—that was the wire you were talking about manufactured by General Cable?" Webb responded: "Yes."

19

to trim the wire and cut the insulation back, and make a termination into the junction box." (Italics added.) Webb stated it was the same process with a range. "You bring in the line for that. The same gauge wire, and put a junction box in. With the junction box, you take and put your cable in through the connector and strip back the wire that have the high-heat resistant [*sic*] because *the wire that we have that come in Romex, which would be TW*, and then you make a connection, and then you . . . connect that that cable into the panel." (Italics added.)

Later in his testimony, Webb explained he used "Romex . . . to accommodate the high-temperature wire." Asked what other types of General Cable wire he used, Webb said: "It would be THW, THWN, and I think two or three other types. I forget all the names. . . . I think some of it was RH." Webb was again asked, "Was there any other General Cable wire that you were hooking up into high-temperature applications manufactured by General Cable, other than Romex?" He responded: "Yes. Like I stated before, it would depend on the application. If it was a commercial job or something that needed wiring, the conduit pipe, which would be your EMT, things of this sort, we didn't pull Romex through that. We'd pull TW, THW, whatever the case may be, to a junction box and made [*sic*] the same application. . . . [W]e didn't use Romex, but we used a different wire that was made by General Cable to pull through there." Plaintiffs offered no testimony that TW, THW, THWN, or RH wires were "heat wire" or contained asbestos.[8]

---

[8] The only testimony in the record about such products suggests that they did not contain asbestos. Ay testified he did not know what "T type wire," "THW," or "THHN" meant. Defendant's industrial hygienist expert testified that THWN wire is "thermal heat water nylon" and THHN is "thermal high heat nylon," and that he did not find anything to suggest those

In fact, when asked whether he "would at times use wire manufactured by General Cable" for the "high-temperature applications," Webb testified, "For the high-temperature wire, it's very seldom we would get high-temperature wire to pull in to accommodate appliance unit and things. With Romex and things of this sort, it was already on the—it was put in by others."[9] When asked to explain, Webb responded: "It was put in by whoever made the appliance or the unit that we was [*sic*] wiring. [¶] . . . [¶] They put that in there for it to be hooked up. And we had to terminate it by stripping it and hooking it to the wire we bring in. [¶] . . . [¶] . . . We didn't put no wires in. They did." Counsel read a portion of Webb's deposition testimony to the jury in which Webb confirmed that he did not know who made the heat wire that came in the appliances he helped install.

At oral argument in this appeal, plaintiffs' counsel argued that Webb testified he worked with heat wire manufactured by General Cable, but counsel did not provide any specific record citations supporting that assertion. Counsel *did* reference Webb's testimony that approximately 60 percent of the wire he used when he worked at Littles came from General Cable, but Webb did not state in that testimony that he used any General Cable *heat* wire.

Rather, Webb's testimony regarding "heat wire" showed that in his work as an electrician, he manipulated and stripped heat wire or "pigtail"

---

products contained asbestos. Notably, plaintiffs did not argue to the jury below, nor in their appellate briefing, that these types of wires were "heat wire" or contained asbestos.

[9] Webb's reference to Romex in this sentence is confusing. In any event, this ambiguous testimony, which plaintiffs did not discuss in their briefing, is not substantial evidence that Webb used heat wire manufactured by General Cable to hook up high-heat appliances.

that came preinstalled in appliances in order to obtain a proper electrical connection. Webb did not know who manufactured the wire that came with the appliances, and he presented no evidence General Cable supplied heat wire to manufacturers for appliances he installed. Webb affirmed that he used wire manufactured by General Cable to hook up to high-heat appliances, but he testified that wire was Romex, "Number 8," TW, THW, THWN, RH, and "a different wire that was made by General Cable"—not "heat wire." The mere possibility that Webb may at some point have used or encountered heat wire manufactured by General Cable is insufficient to meet plaintiffs' burden to present substantial evidence on the threshold issue of exposure. (*McGonnell v. Kaiser Gypsum Co.*, *supra*, 98 Cal.App.4th at p. 1105.)

In sum, viewing all of the evidence in the light most favorable to plaintiffs, we conclude they have failed to present substantial evidence Webb was exposed to products manufactured by defendant that contained asbestos. Accordingly, the judgment must be reversed, and judgment must be entered in defendant's favor. (Code Civ. Proc., § 629, subd. (c); *Bank of America v. Superior Court* (1990) 220 Cal.App.3d 613, 624.) Given our conclusion that the evidence of exposure was insufficient, we need not reach defendant's arguments regarding plaintiffs' evidence of medical causation, allocation of fault, and excessiveness of the verdict for future noneconomic damages.

### III. DISPOSITION

The judgment is reversed. The trial court is directed to enter judgment in defendant's favor. Appellant is to recover its costs on appeal.

MARGULIES, J.

WE CONCUR:

HUMES, P. J.

BANKE, J.

A159632, A159747